## IN RE ELECTION OF THE UNITED STATES REPRESENTATIVE FOR THE SECOND CONGRESSIONAL DISTRICT (15134)

PETERS, C. J., and BORDEN and BERDON, Js.

---

Decision released December 16, 1994*

* December 16, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Tobin, Levin, Carberry & O'Malley, P.C.*, and *Updike, Kelly & Spellacy, P.C.*, with whom were *Timothy Downs*, pro hac vice, and *Christopher Sautter*, pro hac vice, for the complainant Sam Gejdenson.

*Tyler, Cooper & Alcorn*, for the complainant Edward W. Munster.

BORDEN, J. This is an action brought pursuant to General Statutes § 9-323[1] by Edward W. Munster and

[1] General Statutes § 9-323 provides: "CONTESTS AND COMPLAINTS IN ELECTION OF PRESIDENTIAL ELECTORS, U.S. SENATOR AND REPRESENTATIVE. Any elector or candidate who claims that he is aggrieved by any ruling of any election official in connection with any election for presidential electors and for a senator in Congress and for representative in Congress or any of them, held in his town, or that there was a mistake in the count of the votes cast at such election for candidates for such electors, senator in Congress and representative in Congress, or any of them, at any voting district in his town, or any candidate for such an office who claims that he is aggrieved by a violation of any provision of sections 9-355, 9-357 to 9-361, inclusive, 9-364, 9-364a or 9-365 in the casting of absentee ballots at such election, may bring his complaint to any judge of the supreme court, in which he shall set out the claimed errors of such election official, the claimed errors in the count or the claimed violations of said sections. In any action brought pursuant to the provisions of this section, the complainant shall send a copy of the complaint by first-class mail, or deliver a copy of the complaint by hand, to the state elections enforcement commission. If such complaint is made prior to such election, such judge shall proceed expeditiously to render judgment on the complaint and shall cause notice of the hearing to be given to the secretary of the state and the state elections enforcement commission. If such complaint is made subsequent to the election, it shall be brought within ten days of the election and such judge shall forthwith order a hearing to be had upon such complaint, upon

Sam Gejdenson, in separate petitions, each challenging the results of the election canvass and recanvass (election) for the office of the United States Representative for the Second Congressional District of Connecticut (district).[2] Munster was the candidate of the Republican Party, and Gejdenson was the candidate of

a day not more than five nor less than three days from the making of such order, and shall cause notice of not less than three nor more than five days to be given to any candidate or candidates whose election may be affected by the decision upon such hearing, to such election official, to the secretary of the state, to the state elections enforcement commission and to any other party or parties whom such judge deems proper parties thereto, of the time and place for the hearing upon such complaint. Such judge, with two other judges of the supreme court to be designated by the chief court administrator, shall, on the day fixed for such hearing and without unnecessary delay, proceed to hear the parties. If sufficient reason is shown, such judges may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judges shall thereupon, in the case they, or any two of them, find any error in the rulings of the election official, any mistake in the count of such votes or any violation of said sections, certify the result of their finding or decision, or the finding or decision of a majority of them, to the secretary of the state before the first Monday after the second Wednesday in December. Such judges may order a new election or a change in the existing election schedule. Such certificate of such judges, or a majority of them, shall be final upon all questions relating to the rulings of such election officials, to the correctness of such count and, for the purposes of this section only, such claimed violations, and shall operate to correct the returns of the moderators or presiding officers so as to conform to such finding or decision."

[2] A third candidate, David Bingham, was the candidate of A Connecticut Party. Also, one individual, Howard E. Proper Lamchick, apparently received write-in votes. Although both Bingham and Lamchick were served with notice of this proceeding, neither has moved to join the proceeding as a party.

In addition, Munster's petition was joined by fifty-four other individuals, one from each of the towns located in the Second Congressional District. It was stipulated at trial that each of these individuals, whose names and towns are listed below, was an elector who had voted for Munster in the election, and was aggrieved under § 9-323. Although each of these fifty-four individuals is a party to these proceedings, none of them has played an active role in the proceedings. Furthermore, the secretary of the state, Pauline R. Keezer, and the elections enforcement commission, both of whom

the Democratic Party. Accordingly, their names appeared on all ballots prepared for and used in the election.

The election was held on November 8, 1994.[3] Because the results of the canvass of returns from the election

were given notice pursuant to § 9-323, moved for and were granted party status in the proceeding. They have played an essentially passive role in this proceeding.

Despite the presence of these additional parties, it is clear that the real adversaries in this proceeding are Munster and Gejdenson. Furthermore, it is clear that the claims made in their respective petitions overlap to some extent. The panel, therefore, consolidated the two petitions and they were tried as one case. For ease of reference, therefore, we refer herein to Munster and Gejdenson as the parties to these proceedings.

The names and towns of the fifty-four individuals who joined Munster's petition are as follows: William Falletti, Ashford; Gwen Cambpell, Bolton; Keith Robbins, Bozrah; Martin Weiss, Brooklyn; John Bennett, Sr., Canterbury; Bill Phildrick, Chaplin; Margaret Early, Chester; Nicholas Norton, Colchester; Bryan Andrew, Columbia; Marilyn Chase, Coventry; Margo Marvin, Deep River; Russell Mayhew, Eastford; Ronald Visitainer, East Haddam; Mario Richards, East Lyme; Eric Shoell, Ellington; Linda Dwyer, Essex; Bruce Dougherty, Franklin; Blanche Sedgewick, Griswold; Peter Bartinik, Sr., Groton; Ken Gronbach, Haddam; Randy Roach, Hampton; Jack Burke, Jr., Killingly; Edward Clark, Lebanon; Chris Ruest, Ledyard; James Wright, Lisbon; John Tiffany II, Lyme; Richard Pellegrine, Mansfield; Mike Amara, Middletown; Robert Collins, Montville; Martin Ohlsen, Jr., New London; Sandra M. Steinhart, North Stonington; Gerald E. Kortfelt, Sr., Norwich; Andrew Lombard, Old Lyme; Tom McCarty, Old Saybrook; Guy LaPointe, Plainfield; John Casey, Pomfret; John A. Moulson, Preston; John F. Malloy, Putnam; Diane Norton Giles, Salem; Stephanie Abraham, Scotland; Linda Puetz, Sprague; Dock Sellers, Stafford; Shirl Knox, Sterling; William B. Cutler, Stonington; John E. Mahor, Jr., Thompson; Francine Ouellette, Tolland; Andy Goodhall, Union; John P. Leary, Vernon; Michael Crouch, Voluntown; Mariea Spencer, Waterford; Lorraine M. Cenkus, Westbrook; Linda Makuch, Willington; Maria C. Naumec, Windham; and Christine C. Dursk, Woodstock.

[3] In addition to the office of the United States Representative for the Second Congressional District, the election involved contests for governor and lieutenant governor, United States Senator, state senator, state representative, secretary of the state, treasurer, comptroller, attorney general, sheriff, judge of probate and registrar of voters. Only the results of the election for United States Representative for the Second Congressional District as between Munster and Gejdenson are involved in this case.

were sufficiently close, a mandatory recanvass was conducted pursuant to General Statutes § 9-311a.[4] Following that recanvass, the secretary of the state declared

---

[4] General Statutes § 9-311a provides: "RECANVASS ON CLOSE VOTE. For purposes of this section, state, district and municipal offices shall be as defined in section 9-372 except that the office of presidential elector shall be deemed a state office. Forthwith after a regular or special election for municipal office, or forthwith upon tabulation of the vote for state and district offices by the secretary of the state, when at any such election the plurality of an elected candidate for an office over the vote for a defeated candidate receiving the next highest number of votes was either (1) less than a vote equivalent to one-half of one per cent of the total number of votes cast for the office but not more than two thousand votes, or (2) less than twenty votes, there shall be a recanvass of the returns of the voting machine or voting machines and absentee ballots used in such election for such office unless such defeated candidate or defeated candidates, as the case may be, for such office file a written statement waiving this right to such canvass with the municipal clerk in the case of a municipal office, or with the secretary of the state in the case of a state or district office. In the case of state and district offices, the secretary of the state upon tabulation of the votes for such offices shall notify the town clerks in the state or district, as the case may be, of the state and district offices which qualify for an automatic recanvass and shall also notify each candidate for any such office. When a recanvass is to be held the municipal clerk shall promptly notify the moderator, as defined in section 9-311, who shall proceed forthwith to cause a recanvass of such returns of the office in question in the same manner as is provided in said section 9-311. In addition to the notice required under section 9-311, the moderator shall before such recanvass is made give notice in writing of the time when, and place where, such recanvass is to be made to each candidate for a municipal office which qualifies for an automatic recanvass under this section. Nothing in this section shall preclude the right to judicial proceedings on behalf of a candidate under any provision of chapter 149. For the purposes of this section, 'the total number of votes cast for the office' means in the case of multiple openings for the same office, the total number of electors checked as having voted in the state, district, municipality or political subdivision, as the case may be. When a recanvass of the returns for an office for which there are multiple openings is required by the provisions of this section, the returns for all candidates for all openings for the office shall be recanvassed. No one other than a recanvass official shall take part in the recanvass. If any irregularity in the recanvass procedure is noted by a candidate, he shall be permitted to present evidence of such irregularity in any contest relating to the election."

A recanvass for the office of the secretary of the state was also mandated by this provision.

that 186,030 votes had been cast, that Gejdenson had received 79,160 votes and that Munster had received 79,156 votes. According to those figures, therefore, Gejdenson would have been declared the winner by a margin of four votes.

I

## PROCEDURAL HISTORY

On November 18, 1994, both Munster and Gejdenson filed, pursuant to § 9-323,[5] essentially simultaneous petitions with Ellen A. Peters, the chief justice of the Supreme Court. This is the first time in its history that § 9-323 has been invoked. Pursuant to that statute, on November 21, 1994, Judge Aaron Ment, the chief court administrator, designated Justice David M. Borden and Justice Robert I. Berdon as the two additional members of the panel to adjudicate the claims

[5] It is unclear whether this proceeding is properly considered a matter in the Supreme Court. On one hand, § 9-323 does not refer to the Supreme Court, but to three justices thereof. Furthermore, it is clear that, pursuant to that statute, we—the three justices who constitute the panel—not only decide questions of law, a function within the court's normal appellate jurisdiction, but find facts, a function outside the court's normal jurisdiction except to the extent required in those cases brought pursuant to our original jurisdiction over reapportionment matters under § 2 of article sixteen of the amendments to the Connecticut constitution.

On the other hand, General Statutes § 51-199 (b) (5) provides that "[t]he following matters shall be taken directly to the supreme court . . . (5) any election or primary dispute brought to the supreme court pursuant to section 9-323 or section 9-325 . . . ." General Statutes § 9-325 sets out a procedure for a reservation of questions of law to the Supreme Court by a judge of the superior court hearing a state election dispute pursuant to General Statutes § 9-324, a municipal election dispute pursuant to General Statutes § 9-328, or a primary election dispute pursuant to General Statutes § 9-329a and for a direct appeal to the Supreme Court from a final judgment of the Superior Court rendered in a such an election dispute.

We resolve this conundrum by construing § 51-199 (b) (5) to mean that a proceeding brought pursuant to § 9-323 is in the Supreme Court for administrative purposes. Therefore, we have assigned a Supreme Court docket number to this case, and the Chief Clerk of the Supreme and Appellate Courts will be the official custodian of the records of these proceedings.

made in the respective petitions.[6] Also pursuant to that statute, notice of the petitions, and of the hearing to be held thereon to begin on November 29, 1994, was given by personal or abode service to Munster, Gejdenson, the secretary of the state, the elections enforcement commission, David Bingham and Howard E. Proper Lamchick; see footnote 2; the town clerks of the fifty-four towns comprising the district, and the moderators of the election proceedings within the district. In all, approximately 200 notices were served.[7]

The hearings began on November 29, 1994, pursuant to the order of notice. At the outset, the panel entered several procedural orders. We granted the motion of the secretary of the state and the elections enforcement commission to be made parties to the proceeding. See footnote 2. Upon motions by Munster, we entered two orders. First, we ordered the town clerks, who are the official custodians of all election materials, until further order of the panel, to preserve all election materials used in the election, including actual ballots, absentee ballot materials, such as envelopes, and moderators' reports.[8] Second, we ordered that the secretary of the state, the treasurer and the comptroller not take any

[6] Justices Borden and Berdon were the two next most senior justices of the Supreme Court who were not disqualified in the case.

[7] As we did in open court, we express our appreciation to the sheriffs of New London, Windham, Tolland and Middlesex Counties for their yeoman service in completing the necessary service of process within a very short time span.

[8] In this connection, we rejected Munster's proposal that the preservation order expressly be maintained "until such time as the new United States House of Representatives that convenes in January of 1995 has, pursuant to Article I, Section 5 of the United States Constitution, approved the qualifications of and accepted as a member of the House someone as United States Representative for the Second Congressional District of Connecticut." We did so because Munster's counsel represented that, if we were to order a new election as a result of this proceeding, it was his position that such an election would preclude a proceeding in the House of Representatives challenging the results of the November 8, 1994 election. In that event,

action pursuant to General Statutes § 9-315,[9] until our further order, regarding the election, including the making of any count and the declaration of any person as having been elected as the United States Representative from the district.

Before the start of the evidentiary hearing, we also considered whether this proceeding would be governed by the usual rules of evidence applicable to a trial. The parties took different positions on the issue. Munster argued that because this proceeding was sui generis, the rules of evidence should not apply and that we should instead apply the rules of admissibility governing administrative proceedings under the Uniform Administrative Procedure Act. See General Statutes § 4-178.[10] Gejdenson argued that the rules of evidence

the proposed language would have been susceptible of an interpretation requiring the preservation of records of an election that was no longer relevant.

We recognized, nonetheless, that, depending on our decision in this proceeding, such a further proceeding in the House of Representatives was a possibility. We therefore expressly stated that, when we decided this case, we would be mindful of that possibility and would render a further preservation order if appropriate.

[9] General Statutes § 9-315 provides: "CANVASS FOR PRESIDENTIAL ELECTORS, U.S. SENATOR AND MEMBERS OF CONGRESS. The votes returned as cast for a senator in Congress, representatives in Congress and presidential electors shall be publicly counted by the treasurer, secretary of the state and comptroller on the last Wednesday of the month in which they were cast, and such votes shall be counted in conformity to any decision rendered by the judges of the supreme court as provided in section 9-323. In accordance with the count so made, they shall, on said day, declare what persons are elected senators in the Congress of the United States or representatives in Congress, and the secretary of the state shall forthwith notify them by mail of their election; and they shall declare the proper number of persons having the greatest number of votes to be presidential electors and, in case of an equal vote for said electors, shall determine by lot from the persons having such equal number of votes the persons appointed, and the secretary of the state shall forthwith notify them by mail of their appointment."

[10] General Statutes § 4-178 provides: "CONTESTED CASES. EVIDENCE. In contested cases: (1) Any oral or documentary evidence may be received, but the agency shall, as a matter of policy, provide for the exclusion of irrele-

should apply. We ruled that, although this is a sui generis proceeding insofar as it requires Justices of the Supreme Court not only to determine the law but to find the facts, it is nonetheless also a judicial, rather than an administrative, fact-finding proceeding and that, therefore, we would apply the rules of evidence, exercising our discretion in favor of admissibility insofar as possible. We conducted this proceeding in accordance with this ruling.

For five full days of trial, beginning on November 30, 1994, and ending on December 7, 1994, we heard evidence. Despite the constraints imposed by the time limitations required by § 9-323,[11] each party had a full and fair opportunity to present his evidence and claims. In accordance with the schedule that we established,

---

vant, immaterial or unduly repetitious evidence; (2) agencies shall give effect to the rules of privilege recognized by law; (3) when a hearing will be expedited and the interests of the parties will not be prejudiced substantially, any part of the evidence may be received in written form; (4) documentary evidence may be received in the form of copies or excerpts, if the original is not readily available, and upon request, parties and the agency conducting the proceeding shall be given an opportunity to compare the copy with the original; (5) a party and such agency may conduct cross-examinations required for a full and true disclosure of the facts; (6) notice may be taken of judicially cognizable facts and of generally recognized technical or scientific facts within the agency's specialized knowledge; (7) parties shall be notified in a timely manner of any material noticed, including any agency memoranda or data, and they shall be afforded an opportunity to contest the material so noticed; and (8) the agency's experience, technical competence, and specialized knowledge may be used in the evaluation of the evidence."

[11] Section 9-323 requires that if we "find any error in the rulings of the election official, [or] any mistake in the count of [the] votes [of the election in question]," we must certify our decision "to the secretary of the state *before the first Monday after the second Wednesday in December.*" (Emphasis added.) Because that Monday is December 19, 1994, for all practical purposes we are required by § 9-323 to file our decision with the secretary of the state by the end of the business day on Friday, December 16, 1994. Thus, it has been imperative that we hear and decide this case within less than three weeks from the date of the first hearing. To accomplish that goal, counsel for the parties, as well as the court staff, have cooperated, with us and with each other, with the utmost professionalism.

Munster filed his posttrial brief on December 9, 1994, Gejdenson filed his posttrial brief on December 12, 1994, and we heard final oral argument on the afternoon of December 12, 1994.

## II

### SUBSTANTIVE CLAIMS

Before turning to the substantive claims of the parties, it is useful to set forth what this case does not involve. Neither party has made any claim of criminal conduct. Neither party has made any claim of fraudulent conduct. Neither party has made any claim of willful, deliberate or intentional misconduct. None of the evidence presented by the parties would, in any manner, have supported any such claims. We turn, therefore, to the specific claims that the parties have advanced regarding the election and the recanvass held in the district.

### A

#### THE NORWICH RECOUNT

Both Munster and Gejdensen have claimed that the vote count and recanvass in the town of Norwich were inaccurate as a result of the use of new voting technology in that town. Both candidates were credited with fewer votes in the recanvass than in the original vote count on election night, and, therefore, they both requested that we order a manual recount of the ballots in that town.

Pursuant to No. 94-225 of the 1994 Public Acts,[12] the town of Norwich was designated as one of three

---

[12] Public Acts 1994, No. 94-225 provides: "AN ACT CONCERNING A DEMONSTRATION PROJECT FOR THE USE OF OPTICAL, ELECTRONIC OR MECHANICAL EQUIPMENT FOR THE CASTING AND COUNTING OF BALLOTS.

"Section 18 of public act 93-384 is repealed and the following is substituted in lieu thereof:

towns[13] for a demonstration project for the use of electronic equipment for the casting and counting of ballots in the November, 1994 election. Accordingly, the voting in Norwich for this election was conducted pursuant to the "1994 Marksense Demonstration Project" (demonstration project), rather than pursuant to the usual combination of mechanical machine voting and mechanical tabulation of votes for voters who voted at the polls, and paper ballots and hand counting of the votes of those who voted by absentee ballot, a combination used uniformly in this state for many decades.

Under the demonstration project, a voter who voted at the polls was given a paper ballot on which were indicated the candidates for all of the offices involved in the election. Approximately 3/4 of one inch to the right of each candidate's name was, in light black ink, an

---

"Notwithstanding any provision of title 9 of the general statutes to the contrary, the secretary of the state may authorize, as a demonstration project, the use of optical, electronic or mechanical equipment for the CASTING AND counting of [absentee] ballots in [any town at an election, primary or referendum] NOT MORE THAN THREE TOWNS AT ELECTIONS, PRIMARIES OR REFERENDA IN 1994 OR *1995*, provided *(1)* (A) THE LEGISLATIVE BODY OF ANY SUCH TOWN OR, IN THE CASE OF A TOWN IN WHICH THE LEGISLATIVE BODY IS A TOWN MEETING, THE BOARD OF SELECTMEN, AND (B) THE REGISTRARS OF THE TOWN APPROVE THE USE OF SUCH EQUIPMENT AND (2) THE secretary prescribes specifications for: [(1)] *(A)* The security, testing, set-up, operation and canvassing of the equipment, [(2)] *(B)* the ballots used with the equipment and [(3)] *(C)* the training of election officials in the use of the equipment. NOT LATER THAN JANUARY FIRST IN THE YEAR FOLLOWING THE USE OF SUCH EQUIPMENT BY A TOWN, SUCH TOWN SHALL SUBMIT A REPORT ON SUCH USE TO THE SECRETARY. NOT LATER THAN FEBRUARY 1, 1996, THE SECRETARY SHALL SUBMIT A SUMMARY OF SUCH REPORTS AND RECOMMENDATIONS CONCERNING THE USE OF SUCH EQUIPMENT TO THE JOINT STANDING COMMITTEE OF THE GENERAL ASSEMBLY HAVING COGNIZANCE OF MATTERS RELATING TO ELECTIONS."

[13] The other two towns, namely, Newington and South Windsor, are not within the district.

abbreviation of the candidate's party endorsement, namely, "Rep" for Munster and "Dem" for Gejdenson. Immediately to the right of the party designation was, in heavy black ink, the depiction of what may be described as a horizontal interrupted arrow approximately 9/16 of one inch in total length, the interrupted or blank portion of which was approximately 3/16 of one inch in length. The point of the arrow aimed at the candidate's party designation and, further to the left, his name. At the top of each ballot was the following instruction, which we have reproduced in reduced format as it appeared on the ballot:

To vote, complete the arrow ◀━━◀ at the RIGHT of the candidate's name of your choice. To vote for a candidate whose name is not printed on the ballot, write the name of the candidate in the line provided and complete the arrow.

The voting took place as follows. After having been properly identified and checked, the voter was given such a paper ballot. The moderator's handbook, issued for the demonstration project by the secretary of the state, contains the following suggestions: "When issuing a ballot, the ballot clerk should offer the voter a 'privacy sleeve,' which is a plastic or cardboard sleeve into which the ballot can be inserted so that the markings on the ballot can not be seen. Although each elector should be offered a 'privacy sleeve' he is not required to take it. It is also recommended that when the Ballot Clerk issues a ballot to an elector, the Clerk should say something like 'Vote for just one per office, and connect the front and back of the arrow.' "

The voter then entered a voting booth where he or she marked his ballot with either a number 2 pencil or a pen supplied by the manufacturer of the "marksense machine," a machine designed to read and tabulate the ballots inserted into it. The voter then proceeded to the

machine and inserted the ballot into it for counting. The voter then was required immediately to leave the polling place.[14]

The absentee ballots were in essentially the same form as those used at the polls. After having been properly processed and delivered to the appropriate polling places, the absentee ballots were inserted into the marksense machine for reading and tabulation.

After the mandatory recanvass ordered by the secretary of the state following the November 8 election, the recanvass moderator for Norwich certified to the secretary of the state that Munster had received 3802 votes and Gejdenson had received 5711 votes. Neither Munster nor Gejdenson, however, had confidence in the accuracy of these figures. Accordingly, they filed the petitions in this case.

In that part of his petition devoted to Norwich, Munster alleged that "sufficient inaccuracies and irregularities occurred in the original count and recanvass to require the handcounting of all ballots." He cited an example of an unaccounted discrepancy of ten votes between the number of votes registered by the "memory pack"[15] of a particular machine on election day and the number of votes registered by that memory pack during the recanvass. Munster claimed that this called "into question the validity of the entire count on that machine and the reliability of all the machines." With respect to the absentee ballots, Munster claimed that the technology "showed a similar inconsistency between Election Day and the Recanvass," citing a one vote discrepancy between the number of absentee bal-

---

[14] As discussed later in this opinion, there were provisions in the moderator's handbook governing the situations in which the machine, for various reasons, rejected the ballot.

[15] The "memory pack" was the electronic vote tabulator that was inserted into a marksense machine.

lots registered by the machines on election day and during the recanvass. "Furthermore," Munster alleged, "the overall count for the candidates on the Business Record machines between Election Day and the Recanvass changed by thirteen votes. While such a variation is perhaps understandable when humans do the counting, there is no similar rationale for a supposedly infallible machine count. Accordingly, all the ballots cast in Norwich should be recounted by hand . . . ."

Gejdenson's petition was confined to the Norwich count. He described the system used as follows: it "uses paper ballots on which the voter is to fill in a line between two points to indicate his/her selection. A special scanning device 'reads' the mark and records it accordingly. The advantage of this system over the traditional mechanical voting machines is that it preserves the actual markings of the voter on the ballot. This is in contrast to the mechanical voting machines in which, if an error occurs, there is no original ballot which may be inspected to ascertain directly the intent of the [voter]. . . . The same scanning devices were used to conduct the canvass on election night and the recanvass. Assuming the new scanning machines were reading ballots in the same manner on election night and during the recanvass, the result would have been the same." Gejdenson alleged, however, that there had been a reduction in the number of votes cast for each candidate as recorded on election night and during the recanvass: for Gejdenson, a reduction of twenty-two votes; for Munster, a reduction of nine votes; and for Bingham, a reduction of six votes. Gejdenson asserted that neither during the election night canvass nor during the recanvass did the election officials themselves read the ballots, which were available "to determine the actual count of votes cast for each candidate." Accordingly, Gejdenson requested that we direct that all of the ballots in Norwich be

recounted "by election officials and not by the new counting devices," in order "to ascertain for which candidates votes contained thereon are cast."

At our first hearing, on November 29, 1994, Gejdenson moved for an immediate manual recount of the Norwich ballots, to be conducted while we heard the evidence on the other issues in the case. Munster objected to the timing of the Norwich recount. He argued that to order a recount to begin immediately, before a decision about a general recount of the entire district, would be improper because "if you order a recount as to any town you must order a recount as to all towns because the purpose of the recount is to apply a uniform decision making methodology, uniform rules of counting, to all towns." Munster contended that any rules established for the Norwich recount must "be applicable in any other recount situation in any other town [for which] this panel may ultimately order recounts to be held so that we have uniform rules applying for the recounts."

After full argument on this issue, we ordered an immediate manual recount of all of the Norwich ballots, including the absentee ballots. We rejected Munster's objections to an immediate recount for the following reasons.[16]

First, both parties had asserted the inaccuracy of the count of the Norwich ballots and had requested a manual recount. Therefore, they agreed on the underlying need for such a recount in order to guarantee the reliability of the results of the election. Second, Munster's argument for uniformity of rules for all recounts was unpersuasive, because the Norwich ballots—those cast at the polls and those cast absentee—were unlike any other methods of voting or ballots in any other town

---

[16] Although at the time we did not place our reasoning on the record, we do so now for the purpose of completeness.

in the district. We were unable on November 29, 1994, and are unable now, after we have heard all of the evidence and reviewed all of the challenged Norwich ballots, to perceive how particular rules for counting the Norwich ballots could apply to any other ballots or methods of voting in the district other than the general rule that the voter's intent should be dispositive. Third, to have awaited the ultimate outcome of these proceedings before ordering the Norwich recount that both parties agreed was necessary would have engendered an extraordinarily difficult legal question, the answer to which no one could confidently supply.[17]

Pursuant to our order, the Norwich recount proceeded immediately in accordance with the following procedures. We appointed Professor Colin C. Tait, of the University of Connecticut School of Law, to supervise the recount.[18] His responsibility was to ensure the fairness and accuracy of the recount. He was not authorized, however, to render any judgment as to whether a ballot would be challenged or called as a vote, or as to the merits of any challenge, the determination of which remained with us.

There were six recount teams, each consisting of a ballot caller and two talliers (election officials). The ballot caller, who was a moderator who had worked both the election canvass and the recanvass, and was, there-

---

[17] As noted previously; see footnote 11; we are required to decide this case before December 19, 1994. Were we to have delayed ordering the Norwich recount until rendering our decision in the case, and if that recount were itself to have engendered questions that could only be resolved by us, as in fact it inevitably did, there would have been a question of whether we retained any power to act after December 18, 1994. Prudential judicial policy counseled strongly against structuring a remedy that could have rendered a nullity of these entire proceedings, upon which not only the parties but all of the residents of the district are relying.

[18] We repeat here our deep appreciation, expressed earlier on the record in court, for the extraordinary service rendered by Professor Colin C. Tait to the court, the parties and the people of the district.

fore, familiar with the ballots, was chosen by both the Republican and the Democratic registrars of voters in Norwich. The talliers were persons who had been absentee ballot counters at the election canvass and recanvass, or other election officials who had worked the election canvass and recanvass, and were, therefore, familiar with the ballots. The parties were allowed observers for each team. Only election officials handled ballots, which were counted by voting precincts.

Before a ballot was called as voted for a candidate or, in some instances, as a "no vote," the caller afforded the observers a reasonable opportunity to inspect the ballot and to state whether a challenge would be made. Challenged ballots were not called as voted for any candidate. They were segregated and appropriately noted by the caller, who delivered them to Professor Tait. Unchallenged ballots were called as votes cast for one of the candidates or as "no votes," as the case may have been. The talliers kept a record of the votes, of the "no votes," and of the challenges, frequently comparing their tallies in order to avoid mistakes.

The recount took place in Norwich on December 1 and 2, 1994. The results of the recount were as follows. Gejdenson received 5687 unchallenged votes, Munster received 3793 unchallenged votes, and there were seventy-three challenged ballots.[19] In court, we examined each of the seventy-three ballots, and the parties stated their positions with respect to each ballot. In addition, the parties have had a full opportunity to present further argument on these challenged ballots, both in their posttrial briefs and in final oral argument. We turn, therefore, to our disposition of these seventy-three challenged ballots.

---

[19] Initially, the parties had reserved 296 challenges, consisting of 282 ballots and fourteen absentee ballot envelopes. Ultimately, however, the challenges to the fourteen envelopes were withdrawn, and the parties withdrew their challenges to all but seventy-three of the 282 ballots.

The parties differ fundamentally concerning the proper legal standard that we should employ in determining the disposition of these ballots. Munster argues that, in order for a ballot to be voted for a particular candidate, the voter must have drawn a line that touches both ends of the interrupted or blank portion of the arrow. As Munster phrases it in his posttrial brief, we ought to "require a line touching both ends of the arrow in order to vote . . . ." He does not argue that the width or intensity of the voter's connecting mark be the same as the preprinted portions of the arrow; any width or intensity will suffice. In other words, in his view the voter must have completed the arrow in the sense that a discernible pen or pencil line connects both ends of the interrupted portion of the arrow. If, therefore, there is such a line that connects both ends of the arrow, the vote should be counted for that candidate. If, however, the line does not connect both ends but, for example, connects with one of the interrupted ends of the arrow but ends short in some discernible measure of the other end of the interrupted portion of the arrow, the vote is to be considered invalid and to be recorded as a "no vote." In Munster's view, therefore, our function is not to attempt to discern, to the extent reasonably possible, the voter's intent in making the marks that he or she made, based upon all of the available evidence disclosed by the ballot. Our function, instead, is to examine the ballot in order to determine whether the voter complied strictly with the instruction on the ballot: "To vote, complete the arrow **[depiction of completed arrow]** at the RIGHT of the candidate's name of your choice."

Gejdenson argues, to the contrary, that our function is to determine, to the extent reasonably possible, the intent of the voter in making the marks that he or she made on the ballot, in light of all of the available evidence disclosed by the ballot. We agree with Gejdenson for three reasons.

First, the process of voting, whether by mechanical machine of the kind traditionally used in this state, by our traditional absentee ballot, or by paper ballot to be electronically read, is essentially the process by which a voter expresses his or her intent that a particular candidate represent the voter in the office in question, subject, of course, to the legal principles governing the voting process. That expression of intent is accomplished through the means supplied by the state for that purpose, whether those means are a mechanical machine of the kind traditionally used in this state, our traditional paper absentee ballots, or the marksense demonstration process used in Norwich. Similarly, the process of counting votes, irrespective of the means supplied to the voter for the purpose of voting, is the process of tabulating the individual and collective expressions of the voters' intentions, as disclosed by the particular means supplied for that purpose, and subject, of course, to the legal principles governing the voting process. Thus, in our view, voting and counting votes mean, respectively, expressing intent and tabulating those expressions of intent in accordance with the legal principles governing those processes. Whatever the process used to vote and to count votes, differences in technology should not furnish a basis for disregarding the bedrock principle that the purpose of the voting process is to ascertain the intent of the voters.

Second, the instructional materials issued by the secretary of the state to the moderators in Norwich support the conclusion that the ultimate goal of the demonstration project is to determine the individual and collective expressions of the voters' intentions. In the "Moderator's Handbook—1994 Marksense Demonstration Project," the secretary of the state instructed the moderators as to how to treat a "blank or unreadable ballot," namely, "one on which the machine can not read a single voter for a single office. It might occur

if someone intentionally submitted a ballot, but did not vote for anyone; however, it is much more likely that the voter has incorrectly recorded every one of his votes on the ballot (e.g., circled the names, used X's or checks that the machine could not pick up, or used the wrong kind of pen or pencil)." In such a case, the machine would reject the ballot and the moderator was instructed to review the marking instructions with the voter and encourage him to obtain a new ballot and remark it. If that effort was unsuccessful, however, the voter "should be told that the ballot will be hand counted after the polls close, but if the election officials are unable *to determine what he meant by his markings*, some or all of his votes could be lost." (Emphasis added.) The voter was then to be instructed to deposit his ballot in the "auxiliary bin," in which such ballots were stored for hand counting after the polls closed.

Similarly, the secretary of the state's "Recanvass Manual—1994 Marksense Demonstration Project" instructs that, before the recanvass officials run the previously machine counted ballots through the machine at the recanvass, "the ballots should be scanned for any defects or marking errors which could lead the machine to misread the ballot. (See Marksense Absentee Ballot Manual for a discussion of such errors and defects.) If any such errors or defects are found, the ballot should be set aside for hand counting of the races involved in the recanvass."

The "Absentee Ballot Manual—1994 Marksense Demonstration Project," referred to above, consistently emphasizes the importance of ascertaining the voter's intent. Under the demonstration project, absentee ballots were run through the machine for counting in the same manner as the ballots of those voters voting in person. The absentee ballot manual contains instructions regarding blank ballots. These were bal-

lots that were marked in such a way that the machine could not read any votes, because the voter made such "marks as circles, checks or 'X's' near the candidate's name instead of filling in the vote indicator." The manual instructed the election officials as follows: "**Such ballots should be set aside for hand counting.**" (Bold print in original.) Immediately below this instruction, the manual states: "Some ballots will have to be hand counted. The **rule for counting ballots** is that *the intent of the voter governs.* If the ballot is properly marked, the voter's intent is clear. Many ballots are not properly marked. The statutes provide rules for determining the intent of the voter when the voter has incorrectly cast his ballot." (Bold print and emphasis in original.)

It is clear, therefore, that, if an absentee voter failed to comply with the voting instructions, the process of hand counting the absentee ballots required a search for the intent of the voter. It is equally clear that the requirement of such a search is rooted in our statutes governing the counting of absentee ballots. See General Statutes § 9-150a (j).[20] Because the Norwich absentee ballots were essentially the same as the Norwich ballots used by voters who voted at the polls, and

---

[20] General Statutes § 9-150a (j) provides: "INTENT OF VOTER TO GOVERN; PRESUMPTIONS. In the counting of absentee ballots the intent of the voter shall govern, provided the following conclusive presumptions, where applicable, shall prevail in determining such intent:

"(1) If the names of more candidates for an office than the voter is entitled to vote for are checked or validly written in, then the vote cast for that office shall be deemed an invalid overvote.

"(2) If the name of a candidate who has vacated his candidacy is checked such vote shall not be counted.

"(3) On an absentee ballot on which candidates' names are printed, a vote shall be deemed cast only for each candidate whose name is individually checked or validly written in, except as otherwise provided in this subsection. If a party designation is circled, checked, underscored or similarly marked in any manner, or written in, no vote shall be deemed cast or cancelled for any candidate by virtue of such marking or writing."

because the absentee ballots were designed to be run through the same counting technology, the conclusion is inescapable that the demonstration project contemplated the same search for the intent of the voter when the election officials were hand counting ballots of voters who had voted at the polls. The conclusion is equally inescapable, therefore, that the manual count of all of the Norwich ballots that the parties requested and that we ordered should also be governed by a determination of the intent of the voter as disclosed by his or her ballot. Any other conclusion would have the bizzare result of requiring us to discern the intent of absentee voters, while requiring us to ignore the intent of voters who voted at the polls, despite the fact that both sets of voters used essentially the same ballot and voting technology.

Third, we have long adhered to the principle that ballots should, where reasonably possible, be read so as to effectuate the expressed intent of the voter, so as not unreasonably to disfranchise him or her. "Where the legislature in express terms says that a ballot shall be void for some cause, the courts must undoubtedly hold it to be void; but no voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his favor. Unless a ballot comes clearly within the prohibition of some statute it should be counted, *if from it the wish or will of the voter can be ascertained. State* v. *Bossa,* 69 Conn. 335, 341, 37 A. 977 [1897]; *Flanagan* v. *Hynes,* 75 Conn. 584, 588, 54 A. 737 [1903]; *Moran* v. *Bens,* 144 Conn. 27, 32, 127 A.2d 42 [1956]." (Emphasis added; internal quotation marks omitted.) *Scully* v. *Westport,* 145 Conn. 648, 651–52, 145 A.2d 742 (1958). We see no reason to conclude that the legislature in enacting No. 94-225 of the 1994 Public Acts, and the secretary of the state in implementing it, intended either to depart from this fundamental prin-

ciple or to subvert the democratic process designed to ascertain and implement the will of the people.

Munster's argument to the contrary would require us to ignore the nature of the voting and vote counting process, the clear implications of the demonstration project materials,[21] and this longstanding democratic principle of election law jurisprudence. It would substitute for the common sense task of determining the voter's intent a mechanical determination of whether the voter's mark touched both ends of the interrupted portion of the preprinted arrow. It would convert the printed instructions on the ballot, which were obviously intended to make it easier for the marksense machine to read the ballot and to avoid difficulties in that reading process, into the exclusive manner by which all ballots could legitimately be cast. It would elevate the form of those instructions over the substance of the voting process itself, and would ignore the entire thrust of the instructions to the moderators regarding manual counting of any ballots rejected by the machine. Furthermore, it would subject to an impermissible level of scrutiny, and would risk disfranchising, the elderly, the infirm, the physically or visually disabled and those with marginal literacy skills, who are those most likely to have made the kinds of marks that Munster's proposed test would disqualify.

Such a test, namely, whether the voter's mark touched both ends of the interrupted portion of the arrow, is not what was required by a manual count on election night, is not what was required by a manual

---

[21] By its very nature, a demonstration project is an experiment that may fail. Under Munster's argument, had the marksense machine proven too difficult for all the voters properly to complete their ballots, we would be required to disfranchise these voters through no fault of their own, but by virtue of a failed experiment. We are persuaded, therefore, that an experiment as to how votes are registered and counted should not affect the outcome of an election.

count during the recanvass, and is not what should be required of the manual recount that we ordered. Such a test lacks support in law, reason, experience or sound public policy.

With the proper test in mind, therefore, namely, a search for the expressed intent of the voter, we have scrupulously examined all seventy-three of the challenged ballots. We find as follows with respect to those seventy-three ballots: nineteen ballots should be counted for Munster;[22] fifty-two ballots should be counted for Gejdenson;[23] and two ballots should, by

[22] Those ballots are represented by the following exhibits: M-4-11, M-4-15, M-4-21, M-4-22, M-4-26, M-4-39, M-4-42, M-4-45, M-4-49, M-4-50, M-4-59, M-4-61, M-4-62, M-4-69, M-4-72, M-4-74, M-4-77, M-4-81, M-4-83.

[23] These ballots are represented by the following exhibits: M-4-12, M-4-13, M-4-14, M-4-16, M-4-18, M-4-19, M-4-20, M-4-23, M-4-25, M-4-27, M-4-31, M-4-32, M-4-33, M-4-34, M-4-35, M-4-36, M-4-37, M-4-38, M-4-40, M-4-41, M-4-43, M-4-44, M-4-46, M-4-47, M-4-48, M-4-51, M-4-52, M-4-53, M-4-54, M-4-55, M-4-56, M-4-57, M-4-58, M-4-60, M-4-63, M-4-64, M-4-65, M-4-66, M-4-67, M-4-68, M-4-70, M-4-71, M-4-73, M-4-75, M-4-76, M-4-78, M-4-79, M-4-80, M-4-82, M-4-84, M-4-85, M-4-86.

In this connection, we reject Munster's claim that the ballots represented by the following exhibits should be considered "no votes" because the voters of those ballots improperly designated the party designation of the recipient of the vote in violation of § 9-150a (j) (3): M-4-43, M-4-52, M-4-72, M-4-75. That statute provides in pertinent part: "(j) In the counting of absentee ballots, the intent of the voter shall govern, provided the following conclusive presumptions, where applicable, shall prevail in determining such intent . . . . (3) . . . . If a party designation is circled, checked, underscored or similarly marked in any manner, or written in, no vote shall be deemed cast or cancelled for any candidate by virtue of such marking or writing."

Although the statute by its terms applies only to absentee ballots, because we have determined that the challenged ballots resulting from manual recount of all of the Norwich ballots should be determined according to the intent of the voter, we apply the same principle to these ballots. Nonetheless, Munster's argument fails.

The statute does not, as Munster's argument suggests, invalidate any ballot on which a party designation happens to be indicated. Rather, that statute is intended to apply to absentee ballots the same principle that was enacted by article twenty-four, § 5, of the amendments to the Connecticut constitution. That amendment, adopted on November 19, 1986, eliminated

agreement of the parties, be counted as "no votes."[24]

Excluding the seventy-three challenged ballots, Munster received 3793 votes and Gejdenson received 5687 votes in the Norwich recount that we ordered. Adding in the results of our disposition of the seventy-three challenged ballots, those totals are changed to 3812 votes for Munster, and 5739 votes for Gejdenson.

This does not end our task, however. In order to determine whether any party gained or lost votes as a result of our Norwich recount, we must compare these totals to the total votes for each party according to the number of votes shown on the return to the secretary of the state.

According to the secretary of the state's return of the Norwich recanvass ordered by her, Munster had received 3802 votes and Gejdenson had received 5711

the party lever by providing: "No voting machine or device used at any state or local election shall be equipped with a straight ticket device." After that amendment, therefore, it was no longer possible, as it had been before the amendment, for a voter to vote for all of the candidates of a particular party simply by pulling one party lever; every voter must now vote individually for each candidate by pulling down the lever above the candidate's name.

Both the language and the legislative history of § 9-150a (j) (3) make clear that it was intended to apply to absentee ballots the same prohibition against straight party voting, without voting for each candidate, that the constitutional amendment applies to machine voting. The language of the statute provides that, if a ballot contains a written party designation, "no vote shall be deemed *cast or cancelled* for any candidate by virtue of such marking or writing." (Emphasis added.) The legislative history of No. 87-197 of the 1987 Public Acts, which became § 9-150a (j) (3), makes clear that it was intended to ensure that the constitutional elimination of the party lever also applied to absentee ballots. See 30 H.R. Proc., Pt. 13, 1987 Sess., pp. 4881, 4886–87, remarks of Representative Jonathan W. Pelto.

Applying this principle to the four ballots in question, we conclude that they do not violate § 9-150a (j) (3). In none of them did the voter express an intent to vote a straight party ticket solely by indicating the party. In all, the voter expressed his intent by voting individually for Gejdenson. By its language, § 9-150a (j) (3) mandates that these votes not be deemed cancelled.

[24] These ballots are represented by the following exhibits: M-4-7, M-4-28.

votes. Comparing those figures to the results of the recount that we ordered, we find that, as a result of that recount, Munster's total votes from Norwich should be increased by ten votes (3812 minus 3802), and Gejdenson's total votes from Norwich should be increased by twenty-eight votes (5739 minus 5711). This means that, as a result of the Norwich recount, there was a net gain of eighteen votes (twenty-eight minus ten) in favor of Gejdenson.

To summarize, as a result of the Norwich recount that we ordered, and through our careful review of the seventy-three Norwich ballots challenged by the parties, we have determined that, before any of Munster's other claims are considered, Gejdenson has a preliminary lead of twenty-two votes, which is comprised of his four vote lead in the secretary of the state's recanvass results plus the net gain of eighteen votes as a result of the Norwich recount. The secretary of the state's recanvass results showed Gejdenson with 79,160 votes and Munster with 79,156 votes. Adjusting for the Norwich recount, we now show Gejdenson with a preliminary total of 79,188 votes (an increase of twenty-eight votes), and Munster with a preliminary total of 79,166 votes (an increase of ten votes).

## B

### MUNSTER'S OTHER CLAIMS

Munster's original petition challenged the results of the election in several towns other than Norwich, and in several other respects. Because of the time constraints mandated by § 9-323, which made it difficult to undertake a full investigation of alleged irregularities before the drafting and filing of his original petition, Munster's original claims were broader than his final claims. During the hearings, Munster represented to the panel that his final claims, as ultimately required to be responded to by Gejdenson and to be determined

by us, would be only those presented in his posttrial brief. We turn, therefore, to the claims contained in that brief.

Munster's claims fall into four categories, which can be characterized as follows: (1) improper counting of certain identified ballots; (2) irregularities in absentee ballot handling; (3) disparate treatment of similar cases; and (4) other irregularities. The evidence regarding these claims, Munster asserts, requires that we order a new election.

We disagree. We conclude, to the contrary, that considering all of the evidence in the light of the applicable law, there is no merit to Munster's claim for a new election. We conclude further, based on the evidence presented to us and the facts we find to have been proven by a preponderance of that evidence,[25] that: (1) those few irregularities that we find to have been proven are wholly insufficient to undermine the election; (2) it would be inconsistent with the applicable law, and with the sound democratic principles that underlie that law, to order a new election; and (3) Gejdenson was duly elected on November 8, 1994, as the United States Representative for the Second Congressional District of Connecticut.

1

Improper Counting of Ballots

Munster claims that certain votes that were cast in the towns of Waterford, Killingly and Bozrah constitute voting irregularities. We find most of these claims to be unproven.

---

[25] Both parties agree, as do we, that the usual civil standard of a preponderance of the evidence is the appropriate burden of persuasion applicable to this case. See *Donovan* v. *Davis*, 85 Conn. 394, 400, 82 A. 1025 (1912).

i

## Ballots discovered at recanvass

In Waterford, twelve absentee ballots were counted at the recount, seven for Gejdenson and five for Munster, even though they had not been counted on election day. Munster claims that these votes should not have been counted. We disagree.

The facts are that these ballots had been properly executed, properly delivered to the town clerk and subsequently properly delivered by her to the absentee ballot counters for the noon count of absentee ballots on election day. By some oversight, however, the envelopes containing these ballots were not opened by the counters on election day and, therefore, the ballots were not counted. Instead, after the count, the unopened envelopes containing these ballots were returned to the town clerk in the appropriate sealed depository envelope designated for the purpose of maintaining election materials. The town clerk retained these envelopes in the sealed depository envelope, along with all of the absentee ballots that had been counted and the corresponding absentee ballot envelopes, until the day of the recanvass.

At the recanvass, it was discovered that these envelopes had not been opened, and that the absentee ballots in them had not, therefore, been counted on election day. In accordance with the ruling of the election officials, the envelopes were opened and the ballots counted.

Munster argues that the votes cast by these ballots should be invalidated because the ballots were not originally counted on election day. He contends that, pursuant to § 9-311a; see footnote 4; and General Statutes

§ 9-311,[26] "the universe of ballots subject to *recanvass* on recanvass day is limited to those ballots that were initially *canvassed* on Election Day, either counted or

[26] General Statutes § 9-311, as amended by Public Acts 1993, No. 93-30, §§ 9, 14, provides: "RECANVASS IN CASE OF DISCREPANCY. If, within three days after an election, it appears to the moderator that there is a discrepancy in the returns of any voting district, such moderator shall forthwith within said period summon, by written notice delivered personally, the recanvass officials, consisting of the mechanic or mechanics, at least two checkers of different political parties and at least two absentee ballot counters of different political parties who served at such election, and the registrars of voters and the clerk of the municipality in which the election was held. Such written notice shall require such clerk to bring with him the depository envelopes required by section 9-150a, the package of write-in ballots provided for in section 9-310, the absentee ballot applications, the list of absentee ballot applications, the registry list and the moderators' returns and shall require such recanvass officials to meet at a specified time within five days after such election to recanvass the returns of a voting machine or voting machines or absentee ballots or write-in ballots used in such district in such election. If any of such recanvass officials are unavailable at the time of the recanvass, the registrar of voters of the same political party as that of the recanvass official unable to attend shall designate another elector having previous training and experience in the conduct of elections to take his place. Before such recanvass is made, such moderator shall give notice, in writing, to the chairman of the town committee of each political party which nominated candidates for the election, and, in the case of a state election, to the secretary of the state, of the time and place where such recanvass is to be made; and each such chairman may send two representatives to be present at such recanvass. Such representatives may observe, but no one other than a recanvass official may take part in the recanvass. If any irregularity in the recanvass procedure is noted by such a representative, he shall be permitted to present evidence of such irregularity in any contest relating to the election. The moderator shall determine the place or places where the recanvass shall be conducted and, if such recanvass is held before the machines are boxed and collected in the manner required by section 9-266, the moderator may either require that such recanvass of such machines be conducted in each place where the machines are located, or he may require that they be removed to one central place, where such recanvass shall be conducted. All recanvassing procedures shall be open to public observation. Such recanvass officials shall, in the presence of such moderator and clerk, make a record of the number on the seal and the number on the protective counter, if one is provided, on each voting machine specified by such moderator. Such clerk in the presence of such moderator shall turn over the keys of each such machine to such recanvass officials, and such recanvass officials, in the presence of

rejected." (Emphasis in original.) Thus, he argues, "[t]he issue upon recanvass is, therefore, *nothing more* than recounting those absentee ballots *considered* by

such clerk and moderator, shall immediately proceed to open the counter compartment of each such machine and, without unlocking such machine against voting, recanvass the vote cast thereon, and shall then open the package of absentee ballots and recanvass the vote cast thereon. In the course of the recanvass of the absentee ballot vote the recanvass officials shall check all outer envelopes for absentee ballots against the inner envelopes for such ballots and against the registry list to verify postmarks, addresses and registry list markings and also to determine whether the number of envelopes from which absentee ballots have been removed is the same as the number of persons checked as having voted by absentee ballot. The write-in ballots shall also be recanvassed at this time. All of the recanvass officials shall use the same forms for tallies and returns as were used at the original canvass and the absentee ballot counters shall also sign the tallies. The votes shall be announced and recorded in the manner prescribed in section 9-309 on return forms provided by the municipal clerk and appended thereto shall be a statement signed by the moderator indicating the time and place of the recanvass and the names, addresses, titles and party affiliations of the recanvass officials. The write-in ballots shall be replaced in a properly secured sealed package. Upon the completion of such recanvass, such machine shall be locked and sealed, the keys thereof shall immediately be returned to such clerk and such machine shall remain so locked until the expiration of ten days after such election or for such longer period as is ordered by a court of competent jurisdiction. The absentee ballots shall be replaced in their wrappers and be resealed by the moderator in the presence of the recanvass officials. Upon the completion of such recanvass, such moderator and at least two of the recanvass officials of different political parties shall forthwith prepare and sign such return forms which shall contain a written statement giving the result of such recanvass for each machine and each package of absentee ballots whose returns were so recanvassed, setting forth whether or not the original canvass was correctly made and stating whether or not the discrepancy still remains unaccounted for. Such return forms containing such statement shall forthwith be filed by the moderator in the office of such clerk. If such recanvass reveals that the original canvass of returns was not correctly made, such return forms containing such statement so filed with the clerk shall constitute a corrected return. In the case of a state election, a recanvass return shall be made in duplicate on a form prescribed and provided by the secretary of the state, and the moderator shall file one copy with the secretary of the state and one copy with the town clerk not later than ten days after the election. Such recanvass return shall be substituted for the original return and shall have the same force and effect as an original return. The term 'moderator,' as used in this section, means, in the case of municipali-

election officials on Election Day, with or without changes in rulings accepting or rejecting ballots that had been questioned." (Emphasis in original.) We disagree.

Section 9-311a provides for the mandatory recanvass that was conducted in this case. Section 9-311 provides the general procedures for conducting a recanvass. There is nothing in either the language or the purpose of either statute to support Munster's cramped reading of these statutes.

The language of the statutes simply refers to a "recanvass." The statutes' purpose is to ensure the true and most accurate count possible of the votes for the candidates in the election. We can conceive of no rationale upon which the legislature, in enacting those statutes, would have intended that the wholly valid ballots of absentee voters, who had complied with all legal requirements for absentee voting, and whose ballots had been properly received by the town clerk and properly delivered to the ballot counters for counting, should nonetheless be excluded from the recanvass solely because the counters overlooked them on election day. Indeed, such a mistake in counting on election day is precisely the kind of mistake that a recanvass is designed to remedy.

A different conclusion would, without any basis in law or reason, disfranchise those twelve voters. This would fly in the face of our longstanding principle that "no voter is to be disfranchised on a doubtful construc-

ties not divided into voting districts, the moderator of the election and, in the case of municipalities divided into voting districts, the head moderator of the election. For the purposes of this section, the term 'registrars of voters,' in a municipality where there are different registrars of voters for different voting districts, means the registrars of voters in the voting district in which, at the last-preceding election, the presiding officer for the purpose of declaring the result of the vote of the whole municipality was moderator."

tion, and statutes tending to limit the exercise of the ballot should be liberally construed in his favor." (Internal quotation marks omitted.) *Scully* v. *Westport*, supra, 145 Conn. 651–52. We decline to adopt such a bizarre construction of our recanvass statutes.

In sum, therefore, with respect to the set of claimed irregularites characterized as ballots discovered at recanvass, we conclude that all twelve ballots were properly counted at the recanvass.

ii

Ineligible voters

Munster claims that, in Killingly, three voters, Jennifer O'Leary, George Katsikis and Tasia Katsikis, were improperly permitted to vote on election day even though their names had been deleted from the voter lists. He also claims that, in Bozrah, one voter was improperly permitted to vote on election day even though the address given for him on the voter list was an uninhabitable dwelling. We agree with the first of these claims, but not with the second.

Munster's legal claim about the voters in Killingly is that they were improperly restored to the voter lists in violation of the provisions of General Statutes § 9-42.[27] Thus, he argues, their three votes were invalidly counted and, because it cannot be determined

---

[27] General Statutes § 9-42 provides: "RESTORATION OF NAMES UNDER CERTAIN CIRCUMSTANCES. If it appears at any time that the name of an elector who was formerly admitted or registered as an elector in a town and who is a bona fide resident of such town has been omitted from the corrected list by clerical error, or upon presentation under oath of satisfactory evidence to the registrar that such elector is still a bona fide resident of such town, such name shall be added to the list, and the registrars shall, upon the application of any elector, add such name to such list; provided no name shall be added to the list on election day, under the authority conferred by this section, without the consent of both registrars; and provided the name of no elector shall be added to the corrected list of electors under the provisions of this section, unless his name or some name intended for

for whom they voted without infringing on the voters' rights to a secret ballot under article sixth, § 5, of the Connecticut constitution,[28] they constitute significant irregularities in the voting process. We agree that these voters should not have been permitted to vote.

The facts regarding the claims about voter restoration are as follows. Jennifer O'Leary registered to vote in Killingly in August, 1992, listing her address as 31 Shepard Hill, where she resided with her parents. In May, 1994, pursuant to General Statutes § 9-35[29] the

his name was on the corrected list for at least one of the four years previous or on one of the preliminary lists for the year in which the registrars are in session."

[28] Article sixth, § 5, of the Connecticut constitution, as amended by article twenty-four of the amendments to the Connecticut constitution, provides: "In all elections of officers of the state, or members of the general assembly, the votes of the electors shall be by ballot, either written or printed, except that voting machines or other mechanical devices for voting may be used in all elections in the state, under such regulations as may be prescribed by law. No voting machine or device used at any state or local election shall be equipped with a straight ticket device. The right of secret voting shall be preserved."

[29] General Statutes § 9-35 provides: "MAKING AND ARRANGEMENT OF PRELIMINARY REGISTRY LIST; REMOVAL OF NAMES; CHANGE OF ADDRESS WITHIN MUNICIPALITY. The registrars, on the Tuesday of the fifth week before each regular election, shall be in session for the purpose of completing a correct list of all electors who will be entitled to vote at such election. Such session shall be held during such hours between nine o'clock a.m. and five o'clock p.m. as the registrars find necessary to complete the list. Notice of such session shall be given at least five days before the session by publication in a newspaper having a circulation in such municipality, if any, and by posting on the signpost therein, if any, or at some other exterior place near the office of the town clerk. They shall remove from the list the name of each elector who has died, who has been disfranchised or who has removed from the municipality, except electors entitled to remain on such list under the provisions of this chapter. The registrars shall enter the names on such list by street and number of the house, when the houses are numbered, so that there shall be entered on the list first, the street, avenue or road; second, the number of the house or residence in numerical order or, if the registrars of any town find it more convenient, by odd and even numbers in numerical order; and third, the names of the electors in such house in alphabetical order. The names of any electors who cannot be so listed shall be listed alphabetically in the voting district wherein any such elector is

Killingly registrars of voters sent her a canvass card that she returned in July, indicating that she had moved to 93 School Street, Putnam. Accordingly, the registrars removed her name from the Killingly voting list.

a bona fide resident. The registrars of voters may consecutively number the names on the registry list, provided such list shall comply in all respects with the requirements of law other than for the addition of such numbers. In any case in which the registrars have obtained reliable information of an elector's change of address within the municipality, they shall enter the name of such elector on the registry list at the place where he then resides. In each municipality, the registrars shall send by first-class mail to the last-known address of each elector whose name has been removed from the registry list during the session held on the Tuesday of the fifth week before each regular election because of removal from the municipality, a notice of removal from the registry list, making use of forms prescribed by the secretary of the state; and unless a continuance of registration is effected not later than seven days before the regular election next succeeding, the registration of such elector shall remain cancelled. If a notice of canvass sent by mail pursuant to section 9-32 is returned to the registrar marked undeliverable, the registrar shall either send a notice of removal as provided for in this section or cause a legal notice of the elector's removal to be published in a newspaper having a substantial circulation in the municipality. At any time preceding such session to be held on the Tuesday of the fifth week prior to a regular election, when the registrars of voters have information leading them to believe that an elector has removed from the municipality, such registrars may send a notice of removal from the registry list to such elector stating that his name will be removed from the registry list sixty days after the sending of such notice unless a continuance of registration is effected within such sixty days. If the notice of removal is sent within sixty days before the session of the registrars on the Tuesday of the fifth week before an election, such name shall be removed at such session and unless a continuance of registration is effected not later than seven days before such election, the registration of such elector shall remain cancelled, and if the notice of removal is sent within sixty days before the session of the registrars on the fourteenth day before a primary, it shall be removed after such primary. Such notice of removal from the registry list shall be on a form prescribed by the secretary of the state. Whenever the registrars of voters send a notice of removal from the registry list, such notice shall specify the cause of such removal and the statutory sections in which voting privileges to which such elector may be entitled are provided, and shall include a statement that such sections may be seen in the office of the registrars of voters or the office of the town clerk. Such registrars shall retain a duplicate copy of each such notice in their office or, if they do not have a permanent office, in the office space provided under

O'Leary returned the canvass card without thinking through the matter. She did not register to vote in Putnam. She had rented an apartment there because it was convenient to her place of work. Nonetheless, she still considers 31 Shepard Hill Road, Killingly, to be her permanent address and home. She maintains a bedroom and her wardrobe there, she keeps her pets there, her car is registered there, her driver's license indicates that as her residence, and most of her mail goes there.

When O'Leary went to Killingly to vote, she persuaded the election workers that she continued to be a resident of Killingly even though her name was no longer on the voting list. The election workers wrote her name on the voting list at 31 Shepard Hill Road and permitted her to vote. The election workers acted, however, without the consent of either registrar of voters, and without requesting that O'Leary fill out a voter registration card. After the election, the registrars of voters restored her to the voting list at the Shepard Hill address.

The facts about George and Tasia Katsikis are that, although they had been registered to vote in Killingly, they had indicated that they had moved to 10 Bunny

section 9-5a, and shall note on such duplicate copy the date on which such notice was mailed. Notwithstanding any other provision of this section, if an elector's signed response to a notice of canvass by mail under section 9-32 states that such elector is no longer a bona fide resident of the municipality, the registrars of voters may remove such elector's name from the registry list without sending such elector a notice of removal, provided that no such elector's name may be so removed for reason of removal from the municipality after the Tuesday of the fifth week before each regular election. In each municipality, any elector, upon change of residence within the municipality, may cause his registration to be transferred to his new address by presenting to the registrars a signed request therefor, stating his present address, the date he moved to such address and the address at which he was last registered. The registrars shall thereupon enter his name on the list at his new residence; provided no transfer of registration shall be made on the registry list on election day without the consent of both registrars."

Lane, Danielson,[30] in reply to canvass cards mailed to them by Rita LaBelle, one of the Killingly registrars of voters. Their new address is on a street that, although it has a Danielson, and thus Killingly, post office, is actually across a bridge and is part of the town of Brooklyn. Accordingly, in July, 1994, the registrars of voters removed their names from the Killingly voting lists. On election day, the Katsikises went to the Killingly voting place for Adelaide Street, and satisfied the election workers, including LaBelle, that they lived at 95 Adelaide Street. Their names were written on the voting list, with 95 Adelaide Street as their address, and they were permitted to vote. They were, however, restored to the voting list without the consent of Emily Harrington, the other registrar of voters.

Munster's claims regarding O'Leary and the Katsikises rest on the provision of § 9-42 that requires that "no name shall be added to the list on election day, under the authority conferred by this section, without the consent of both registrars." See footnote 27. He argues that this provision is mandatory, and that the lack of that joint consent prohibited any election officials from adding O'Leary's and the Katsikises' names to the voting lists on election day and, thus, from permitting them to vote. We agree.

Section 9-42 provides the procedure pursuant to which a voter, whose name was stricken from a voter list, may have his or her name restored to the list. It contains a specific provision, however, phrased in what is ordinarily considered to be mandatory language, for such a restoration on election day: the consent of both registrars of voters. Both registrars were available during election day, albeit perhaps not right then and there. The inconvenience of awaiting their consent, however, is not enough to overcome the important policies behind the statutory provision.

[30] Danielson is part of the town of Killingly.

Because those registrars are each selected from the two major parties—Democratic and Republican—the manifest purposes of this statutory limitation are to protect against one party taking improper advantage of the other, and to ensure that the members of each party are confident that their interests are protected against such an event. We cannot consider this provision as anything other than mandatory. We therefore conclude that O'Leary and the Katsikises were improperly added to the voting lists on election day and that they were improperly permitted to vote.

Munster also claims that, in Bozrah, George Gager was permitted to vote in violation of § 9-35. Gager was on the Bozrah voting list with an address of 15 Gager Road. On election day, he satisfied the poll checkers in charge of that list that he was a resident of Bozrah, showed appropriate identification, and was permitted to vote. In fact, 15 Gager Road is, and has been for three years, an unoccupied, uninhabitable, burned out house.

Munster argues that, like the votes of O'Leary and the Katsikises in Killingly, Gager's vote should be considered invalid because "the voter was not living where the list showed him as living, and there is no evidence he was living anywhere else in Bozrah." We disagree. Unlike the cases of O'Leary and the Katsikises, there is no evidence here that anyone made a transfer of Gager's registration to a new address on the registry list. There was, therefore, no proof of a violation of § 9-42 by such a transfer of registration without the consent of both registrars. Moreover, Munster, who had the burden of persuasion regarding any voting irregularity that he claimed, did not prove that Gager did not reside in Bozrah on election day or was not registered in Bozrah on election day. Although his specific address as disclosed by the list may have been inaccurate, we

conclude that any irregularity in permitting him to vote under these circumstances was de minimis.

In sum, therefore, with respect to this set of claimed irregularities characterized as ineligible voters, we conclude that Munster has established that three voters in Killingly were permitted to vote who should not have been, and that Munster has failed to prove that the challenged vote in Bozrah was improperly cast.

2

Irregularities In Absentee Ballot Handling

Under this heading, Munster raises two different categories of claims of irregularities regarding absentee ballots. The first is the claimed lack of proper signatures of certain town clerks on outer envelopes containing absentee ballots that had been properly delivered to those town clerks. The second consists of a series of other claimed irregularities in the documentation required by the statute for absentee ballots.

i

The signature of the town clerk (General Statutes § 9-140c [a])[31]

Chapter 145 of the General Statutes §§ 9-133f through 9-159r, governs the process of voting by absentee bal-

---

[31] General Statutes § 9-140c provides: "LIST OF APPLICANTS RETURNING BALLOTS TO CLERK. SORTING OF BALLOTS AND CHECKING OF NAMES ON REGISTRY LIST; REJECTION OF BALLOT IF NAME NOT ON LIST. TIMES FOR DELIVERY OF BALLOTS FOR COUNTING. PRESERVATION OF SECRECY. LATE BALLOTS RETAINED BY CLERK. (a) The municipal clerk shall retain the envelopes containing absentee ballots received by him under section 9-140b and shall not open such envelopes. The municipal clerk shall endorse over his signature, upon each outer envelope as he receives it, the date and precise time of its receipt. The clerk shall make an affidavit attesting to the accuracy of all such endorsements, and at the close of the polls shall deliver such affidavit to the head moderator, who shall endorse the time of its receipt and return it to the clerk after all counting is complete. The clerk shall preserve the affidavit for one hundred eighty days in accordance with the

lots. Insofar as these statutes are relevant to this case, those statutes require, in general, that the following procedures be followed.[32] Moreover, the evidence in this case persuades us that, except in those few discrete instances of irregularity noted later in this opinion, the election officials throughout the district followed the statutory requirements with admirable scrupulousness.

An applicant for an absentee ballot must deliver his or her application to the town clerk on a form prescribed and furnished by the secretary of the state. General Statutes § 9-139a (a). Upon receipt of the application, the town clerk, after ascertaining that the applicant is a registered voter in the town, must deliver an "absentee voting set" to the applicant. The set consists of an absentee ballot, inner and outer envelopes for the ballot's return, and instructions for its use. General Statutes § 9-140 (d). The outer envelope must contain a serial number, and the town clerk must maintain a log, identifying the name and address of the applicant and the serial number of the outer envelope delivered to the applicant. General Statutes § 9-140 (a).

Upon receipt of the set, the absentee ballot voter must sign the form printed on the inner envelope, which, in accordance with General Statutes § 9-137,[33]

requirements of section 9-150b. The clerk shall keep a list of the names of the applicants who return absentee ballots to the clerk under section 9-140b. The list shall be preserved as a public record as required by section 9-150b."

[32] The description that follows also draws upon the evidence presented to us regarding the procedures followed generally in the election at issue in this case.

[33] General Statutes § 9-137 provides: "INNER ENVELOPE FOR RETURN OF BALLOT; STATEMENT UNDER FALSE STATEMENT PENALTY. Each absentee ballot shall be returned to the municipal clerk, inserted in an inner envelope which shall be capable of being sealed and which shall have printed on its face a form containing the following statements:

'I hereby state under the penalties of false statement in absentee balloting that I am eligible to vote at the primary, election or referendum in the municipality in which this absentee ballot is to be cast and that I expect to be unable to appear at my polling place during the hours of voting at

constitutes a statement under the penalties of false statement that the applicant is entitled to vote by absentee ballot. General Statutes § 9-140a.[34] Pursuant to General Statutes § 9-140a, the absentee ballot voter then inserts the ballot into the inner envelope, which the voter in turn inserts into the outer envelope for return to the town clerk.

Upon receipt of the outer envelope, the town clerk logs it in, checking it against his or her log of absentee ballot sets sent out. The town clerk also is required to endorse on the outer envelope, over his or her signature, the date and time of its receipt. General Statutes § 9-140c (a). The town clerk is required to execute an affidavit attesting to the accuracy of all of his or her endorsements and, at the close of the polls on election day, to deliver that affidavit to the head moderator, who in turn endorses on the affidavit the time of receipt. The head moderator later returns the affidavit to the town clerk after the counting of the absentee ballots. General Statutes § 9-140c. The town clerk

such primary, election or referendum for one or more of the following reasons: (1) My active service in the armed forces; (2) my absence from the town in which I am eligible to vote during all of the hours of voting; (3) my illness or physical disability; (4) the tenets of my religion which forbid secular activity on the day of the primary, election or referendum; or (5) my duties as a primary, election or referendum official.

Date . . . .

. . . . (Signature).' "

[34] General Statutes § 9-140a provides: "SIGNING OF FORM. INSERTION OF BALLOT IN ENVELOPES. Each absentee ballot applicant shall sign the form on the inner envelope provided for in section 9-137, which shall constitute a statement under the penalties of false statement in absentee balloting. Any absentee ballot applicant who is unable to write may cause his name to be signed on the form by an authorized agent who shall, in the space provided for the signature, write the name of the applicant followed by the word 'by' and his own signature. The failure of the applicant or authorized agent to date the form shall not invalidate the ballot. The ballot shall be inserted in the inner envelope, and the inner envelope shall be inserted in the outer envelope, prior to the return of the ballot to the municipal clerk."

may not open any outer envelope, but retains all such envelopes securely in his or her office until they are ready for counting on election day.

The evidence before us disclosed that the counting procedure, as required by General Statutes §§ 9-140c, 9-150a and 9-150b,[35] proceeds along the following gen-

[35] General Statutes § 9-150a provides: "COUNTING PROCEDURES.

"(A) STARTING TIME. Not earlier than twelve o'clock noon on the day of the election, primary or referendum the absentee ballot counters shall proceed to the polling places for which they have been assigned ballots, or to the central counting location.

"(b) DELIVERY AND CHECKING OF BALLOTS. At the time each group of ballots is delivered to them pursuant to section 9-140c, the counters shall perform any checking of such ballots required by subsection (i) of said section and shall then proceed as hereinafter provided.

"(c) REMOVAL OF INNER ENVELOPES. COUNT OF TOTAL NUMBER OF BALLOTS RECEIVED. Except with respect to ballots marked 'Rejected' pursuant to said section 9-140c or other applicable law, the counters shall remove the inner envelopes from the outer envelopes, shall note the total number of absentee ballots received and shall report such total to the moderator. They shall similarly note and separately so report the total numbers of presidential ballots and overseas ballots received pursuant to sections 9-158a to 9-158m, inclusive.

"(d) BALLOT REJECTED IF INNER ENVELOPE STATEMENT NOT EXECUTED. If the statement on the inner envelope has not been signed as required by section 9-140a, such inner envelope shall not be opened nor the ballot removed therefrom, and such inner envelope shall be replaced in the opened outer envelope which shall be marked 'Rejected' and the reason therefor endorsed thereon by the counters.

"(e) REMOVAL OF BALLOTS FROM INNER ENVELOPES. The counters shall then remove the absentee ballots from the remaining inner envelopes.

"(f) INNER AND OUTER ENVELOPES TO BE SEALED IN DEPOSITORY ENVELOPES. Before the ballots are counted, all opened outer and inner envelopes from which such ballots have been removed, and all outer envelopes marked 'Rejected' as required by law, shall be placed and sealed by the counters, separately by voting district, in depository envelopes prescribed by the secretary of the state and provided by the municipal clerk. The counters shall seal such depository envelopes by wrapping them lengthwise and sideways with nonreusable tape, endorse on each such envelope their names, the voting district and the time of the count, and deliver such envelopes to the moderator.

"(g) MODERATOR TO SUPERVISE COUNTING. The counters shall then count such ballots as provided in this section. The moderator shall supervise the counting.

eral lines. First, the town clerk delivers the outer envelopes to the registrars of voters, who check the voters'

"(h) PROCEDURE MANUAL. The secretary of the state shall provide a procedure manual for counting absentee ballots. The manual shall include a description of the steps to be followed in receiving, handling, counting and preserving absentee ballots. Facsimile ballots shall be printed in the manual, illustrating potential variations in ballot markings along with the correct interpretation to be given in each situation illustrated.

"(i) WRITE-IN VOTES. (1) Except as otherwise provided in this section the provisions of section 9-265 shall apply to write-in votes on absentee ballots at elections.

"(2) Votes cast by absentee ballot at a primary may be counted only for candidates whose names appear on the ballot label on primary day, and no write-in vote shall be counted except as provided in subdivision (3) of this subsection.

"(3) If a write-in vote on an absentee ballot is cast for a candidate for any office whose name appears on the ballot label for that office on election or primary day, such candidate's name shall be deemed to have been checked on such ballot and, except as otherwise provided in subsection (j) of this section, one vote shall be counted and recorded for such candidate for such office.

"(4) Except as otherwise provided in said section 9-265, if the name of a registered write-in candidate for an office is written in for such office on an absentee ballot it shall be deemed validly written in for purposes of subsection (j) of this section.

"(j) INTENT OF VOTER TO GOVERN; PRESUMPTIONS. In the counting of absentee ballots the intent of the voter shall govern, provided the following conclusive presumptions, where applicable, shall prevail in determining such intent:

"(1) If the names of more candidates for an office than the voter is entitled to vote for are checked or validly written in, then the vote cast for that office shall be deemed an invalid overvote.

"(2) If the name of a candidate who has vacated his candidacy is checked such vote shall not be counted.

"(3) On an absentee ballot on which candidates' names are printed, a vote shall be deemed cast only for each candidate whose name is individually checked or validly written in, except as otherwise provided in this subsection. If a party designation is circled, checked, underscored or similarly marked in any manner, or written in, no vote shall be deemed cast or cancelled for any candidate by virtue of such marking or writing.

"(k) QUESTIONS SUBMITTED TO MODERATOR FOR DECISION. If the intent of an absentee voter is difficult to ascertain due to uncertain, conflicting or incorrect ballot markings which are not clearly addressed in this section or in the procedure manual for counting absentee ballots provided by the secretary of the state, the absentee ballot counters shall submit the

name against the official checklist used at the polls on

ballot and their question to the moderator. They shall then count the ballot in accordance with the moderator's decision as to the voter's intent, if such intent is ascertainable. A ballot or part of a ballot on which the intent is determined by the moderator to be not ascertainable, shall not be counted. The moderator shall endorse on the ballot the question and his decision.

"(*l*) REJECTION OF MARKED BALLOTS. No absentee ballot shall be rejected as a marked ballot unless, in the opinion of the moderator, it was marked for the purpose of providing a means of identifying the voter who cast it.

"(m) PLACING OF BALLOTS IN DEPOSITORY ENVELOPES. After the absentee ballots have been so counted they shall be placed by the counters, separately by voting district, in depository envelopes prescribed by the secretary of the state and provided by the municipal clerk. Any notes, worksheets, or other written materials used by the counters in counting such ballots shall be endorsed by them with their names, the date and the time of the count and shall also be placed in such depository envelopes together with the ballots, and with the separate record of the number of votes cast on such ballots for each candidate as required by section 9-150b. Such depository envelopes shall then be sealed, endorsed and delivered to the moderator by the counters in the same manner as provided in subsection (f) of this section."

General Statutes § 9-150b provides: "DUTIES OF MODERATORS AND MUNICIPAL CLERKS. DECLARATION OF COUNT. (a) MODERATOR TO RECORD RESULT OF EACH COUNT. The moderator shall record the result of each count of absentee ballots, separately by time of count, on (1) the moderator's return, or in the case of central counting a separate moderator's return for each voting district, and (2) a separate record of the number of absentee votes cast for each candidate as shown on the moderator's return, or in the case of central counting, such a record for each voting district.

"(b) COUNTING AT POLLS. DECLARATION OF RESULT. If the absentee ballots were counted at the polls, when all counting is complete the moderator shall publicly declare the result of such count as provided in section 9-309 and add such count to the results from the voting machines recorded on the moderator's return. Such return shall show separately the machine vote and the absentee vote and the totals thereof.

"(c) COUNTING AT CENTRAL LOCATION. CENTRAL COUNTING MODERATOR'S RETURN. If the absentee ballots were counted at a central location, when all counting is complete the moderator shall publicly declare the result of such count. He shall then deliver to the head moderator the central counting moderator's returns, together with all other information required by law or by the secretary of the state's instructions. The head moderator shall add the results from the voting machines, recorded on the moderator's return for each polling place, to the absentee count recorded on the central counting moderator's return for the corresponding voting district, in

## election day and indicate thereon that the voters have

the manner prescribed by the secretary of the state. The returns so completed shall show separately the machine vote and the absentee vote and the totals thereof.

"(d) FORMS. The secretary of the state may prescribe the forms and instructions for the tabulation, counting and return of the absentee ballot vote.

"(e) PRESENTATION OF DEPOSITORY ENVELOPES. The sealed depository envelopes required by subsections (f) and (m) of section 9-150a shall be returned by the moderator to the municipal clerk as soon as practicable on or before the day following the election, primary or referendum.

"(f) MUNICIPAL CLERK TO PRESERVE BALLOTS, ENVELOPES AND RELATED MATERIALS. The municipal clerk shall preserve for sixty days after the election, primary or referendum the depository envelopes containing opened envelopes and rejected ballots required by subsection (f) of section 9-150a, and shall so preserve for one hundred eighty days the depository envelopes containing counted ballots and related materials required by subsection (m) of section 9-150a.

"(g) DEPOSITORY ENVELOPES NOT TO BE OPENED; EXCEPTIONS. No such depository envelope shall be opened except by order of a court of competent jurisdiction, by the state elections enforcement commission pursuant to a subpoena issued under subdivision (1) of section 9-7b or within five days of an election, primary or referendum for the purpose of a recanvass conducted pursuant to law. After such a recanvass the depository envelopes and their contents shall be returned to the municipal clerk and preserved for the stated period.

"(h) CLERK TO PRESERVE APPLICATIONS, VOID AND UNUSED BALLOTS, RECORDS. For sixty days after the election, primary or referendum the following shall be preserved by the municipal clerk as a public record open to public inspection: (1) All executed absentee ballot application forms and direction by registrar forms, as required by subdivision (i) of section 9-140; (2) the log of applications issued as required by subsection (a) of section 9-140; (3) the list and index of applicants for presidential or overseas ballots as required by section 9-158h; (4) the numerical list of absentee voting sets issued as required by subsection (e) of section 9-140; (5) the list of the names of persons whose absentee ballots are received by the clerk, as required by subsection (a) of section 9-140c; (6) all unused absentee ballots; and (7) all envelopes containing ballots received by the clerk after the close of the polls, which shall remain unopened.

"(i) CLERK TO PRESERVE AFFIDAVITS. For one hundred eighty days after the election, primary or referendum the following shall be preserved by the municipal clerk as a public record open to public inspection: (1) The affidavit regarding the clerk's endorsement of inner envelopes, as required by subsection (a) of section 9-140c; and (2) the affidavit regarding delivery and receipt of ballots, as required by subsection (j) of said section.

voted by absentee ballot.[36] After this checking procedure is completed, the town clerk seals the unopened package of envelopes and retains them in a safe place. General Statutes § 9-140c (d).

At the appropriate time for counting, the town clerk delivers the sealed package of unopened envelopes to the ballot counters. General Statutes § 9-150a (b). The ballot counters open the package, remove and open the outer envelopes, remove the inner envelopes from the outer envelopes, and count the outer and inner envelopes, checking the two numbers against each other. They also report the total number of absentee ballots to the moderator. If an inner envelope has not been signed by the voter as required by § 9-140a, constituting a statement under penalties of false statement that the voter is entitled to vote by absentee ballot, the inner envelope is not opened; it is replaced in its outer envelope, the outer envelope is marked "rejected," and the reason for the rejection is endorsed thereon by the counters. General Statutes § 9-150a (d).

The inner envelopes are then removed from the remaining outer envelopes, and all of the envelopes, including those rejected, are placed in a special "depository envelope" prescribed by the secretary of the state. The counters carefully seal these depository envelopes with nonreusable tape, endorse them appropriately, and deliver them to the moderator, who ultimately

"(j) DESTRUCTION OF BALLOTS, ENVELOPES AND RELATED MATERIALS. At the expiration of the applicable retention period, if no contest is pending and no subpoena has been issued by the state elections enforcement commission pursuant to subsection (1) of section 9-7b, the municipal clerk shall destroy the materials preserved under this section."

[36] There are two times on election day for such counting: noon; and 6 p.m., for ballots that were delivered to the town clerk after the noon count. Also, there are two methods of counting: by district, pursuant to which the ballots are allocated according to their particular voting districts for counting; and central counting, pursuant to which all of the ballots are counted at one central counting location for the town.

delivers them to the town clerk. The town clerk maintains these depository envelopes, unopened, in a secure place for possible use in a recanvass. General Statutes § 9-150a (f).

At this point, the ballots, which have been removed from their inner envelopes, remain folded, so that the counters cannot ascertain their votes and match them with the envelopes from which they had been removed. Thus, the secrecy of the ballot is maintained. The counters then shuffle the folded ballots, so that they are in random order, before unfolding and counting them.

The counting proceeds in public, usually with representatives of each candidate observing so as to identify and, if necessary, question the call of an ambiguous ballot. If there is a question of the intent of the voter, the questioned ballot is submitted to the moderator, who makes the determination of whether the ballot should be cast and for whom, and endorses his or her decision on the ballot. General Statutes § 9-150a (k). After the ballots are counted, and the votes recorded by the counters, the counters seal them in other special depository envelopes in a fashion similar to the sealing of the depository envelopes for the outer and inner envelopes described above. General Statutes § 9-150a (m). These depository envelopes are delivered to the moderator, who later delivers them to the town clerk for similar safekeeping and preservation. General Statutes § 9-150b (e), (f) and (g).

With this factual background in mind, we turn to Munster's challenges to certain ballots on the ground that the town clerks in question did not sign the outer envelopes, as required by § 9-140c (a). This claim involves a total of 413 outer envelopes for absentee ballots: 403 in Stonington; 3 in Old Saybrook; 6 in Ledyard; and 1 in Norwich. We conclude that, of those 413 ballots, only three were improperly signed in, and the remaining 410 were properly processed.

The facts concerning the 403 Stonington absentee ballots disclose a uniform signature pattern.[37] Although Munster introduced only one of the outer envelopes into evidence, and although he recognizes in his posttrial brief that he had not claimed any additional irregularities based on an alleged lack of a proper signature on other envelopes, the town clerk testified, and we find, that all 403 outer envelopes were treated in the same fashion. We, therefore, consider Munster's claim to apply to all 403 absentee ballots cast in Stonington.

Upon receipt of each absentee ballot outer envelope, the town clerk stamped it using her time stamp machine, with the following printed legend[38] appearing on the outer envelope:

"RECEIVED FOR RECORD
STONINGTON, CT.

94 NOV—8 AM 9:55

RUTH WALLER
TOWN CLERK"[39]

In Old Saybrook, the evidence before us discloses that three of the outer envelopes received by the town clerk were stamped as follows:

"RECEIVED
OCTOBER 14 1994"

[37] Munster's assertion in his posttrial brief that 399 absentee ballots were cast in Stonington is at odds with the evidence, which demonstrates that the correct number is 403.

[38] In this example, as in all those that follow, we have inserted the date and time from the exhibit or exhibits introduced into evidence. Of course, each envelope would have had its own appropriate date and time.

[39] In addition, when the Stonington town clerk delivered the outer envelopes to the moderator, she gave the moderator an affidavit that contained a sample of her time stamp, as indicated in the text, and stated in the affidavit that it was her intention that her printed name and title on the time stamp was her signature as required by § 9-140c (a).

In Ledyard, although the town clerk had a stamp facsimile of her cursive signature that she customarily affixed to the outer envelope upon receipt, the evidence before us discloses that six of the outer envelopes lacked that cursive facsimile, because they arrived during a period in which she was recovering from heart surgery and was out of the office. Her assistant inadvertently failed to affix the town clerk's cursive facsimile. These envelopes were stamped as follows:

"RECEIVED FOR RECORD
AT LEDYARD, CT.

94 OCT 26 AM 10:31

ATTEST: PATRICIA KARNS
TOWN CLERK"

In Norwich, although the town clerk had a stamp facsimile of her cursive signature that she customarily affixed to the outer envelope upon receipt, the evidence before us discloses that one outer envelope lacked that cursive facsimile, and was stamped as follows:

"RECEIVED

94 NOV—7 AM 9:03

BEVERLY C. MULDOON
TOWN-CITY CLERK
NORWICH, CONN"

In deciding whether these various signature stamps comport with the requirements of our law, our point of departure is § 9-140c (a), which provides in relevant part: "The municipal clerk shall endorse over his signature, upon each outer envelope as he receives it, the date and precise time of its receipt." Munster concedes that a stamp of the cursive signature of the town clerk is sufficient for compliance with the statute, on the theory that "[w]ithout implicating the laws prohibiting forgery, no one can go to a stamp store and purchase a

stamp of an incumbent town clerk's signature; only the town clerk can do that. There is, therefore, a decided security and ballot integrity reason for the statute's requirement that the unique and personal signature of the town clerks, actually inscribed or stamped, be used as the receipt for absentee ballot outer envelopes." Munster argues, however, that none of the exemplars shown above complies with the statute.

We agree with Munster that the stamp on the three Old Saybrook outer envelopes does not comply with the statute. We disagree with his claim, however, with regard to the remaining 410 outer envelopes, namely, those in Stonington, Ledyard and Norwich. With respect to those, we conclude that the stamps used by the town clerks sufficiently complied with § 9-140c (a).

The provisions of § 9-140c (a) regarding the date and time of the town clerk's receipt of an absentee ballot envelope, and the town clerk's signature, are manda-tory because they are designed to mitigate the risk of fraud that is inherent in the absentee voting process. *Dombkowski* v. *Messier,* 164 Conn. 204, 319 A.2d 373 (1972). That does not mean, however, that strict, as opposed to substantial, compliance with those provi-sions is required. Rather, there must be substantial compliance with the statutory requirements. *Wrinn* v. *Dunleavy,* 186 Conn. 125, 147, 440 A.2d 261 (1982); *Dombkowski* v. *Messier,* supra, 209.

What constitutes a "signature" has been the subject of legislative enactments and case law outside the elec-tion process arena. Compare, e.g., General Statutes § 7-380 (referring to a "facsimile of any signature"), with General Statutes Annotated § 42a-3-401, comment 2 (West 1990) ("[a] signature may be handwritten, typed, printed or made in any other manner"); see also 72 Am. Jur. 2d, Statute of Frauds § 358 (1974) ("[t]he general rule is that the signature may be affixed by a

stamp, or it may be typewritten or printed mechanically, if . . . by signing in any of these methods the party whose signature is essential intends to authenticate the instrument as his act''). We believe that whether the printed name and title of the respective town clerks, in the exemplars displayed above, constituted substantial compliance with § 9-140c (a), must be determined by reference to the purpose of the statutory requirement, the role played by the requirement viewed in the context of the statutory scheme, the degree of adherence to strict compliance shown, and the basic policy against disfranchisement of voters who are not at fault for any lack of strict compliance.

The purpose of the signature requirement in § 9-140c (a) is to avoid fraud in the voting of absentee ballots. By requiring the town clerk to sign the outer envelope, the statute seeks to avoid the risk that an unauthorized person will somehow include an unauthorized absentee ballot among those validly sent and delivered.

The signature requirement, however, must also be viewed in the context of the entire statutory scheme. That scheme requires that outer envelopes be logged out and logged in, that the serial numbers on the envelopes be checked against those on the sets assigned to absentee voters, that the town clerk deliver to the head moderator an affidavit attesting to the accuracy of all the endorsements on the outer envelopes, and that the count of outer envelopes eventually be checked against the count of inner envelopes. Because this procedural rigor is a significant safeguard against fraud, the fact that the evidence before us reveals punctilious adherence to the remainder of these requirements informs our determination as to whether there has been substantial compliance with the statute. Furthermore, the

extent of deviation from strict compliance is also relevant in drawing an appropriate line between substantial and insubstantial compliance.

Finally, we must recognize the overarching policy that, in construing voting statutes, "no voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his [or her] favor." (Internal quotation marks omitted.) *Scully* v. *Westport,* supra, 145 Conn. 651–52. We, therefore, take into consideration whether the failure of strict compliance was due to the conduct of the voter or of someone not within his or her control.

Applying these considerations to these ballots, we conclude that all but the three Old Saybrook envelopes met the substantial compliance test. The stamp on the Old Saybrook envelopes is merely a generic date stamp and contains no indication, whether by hand signature, stamp facsimile or printed name and title, that it was received by the town clerk. Furthermore, there is no time of receipt indicated on the stamp, as required by the statute. General Statutes § 9-140c (a). The minimal adherence to the requirements of § 9-140c (a) evinced by the endorsements on the three Old Saybrook envelopes in question leads us to conclude that they do not substantially comply with the requirements of § 9-140c (a).

The remaining 410 ballots, however, did substantially comply with those requirements. Although a stamped facsimile of the town clerks' cursive signature would arguably have been preferable, we cannot ascribe critical significance to the difference between such a cursive facsimile and the printed names and titles of the town clerks that were rendered on the envelopes by the town clerks' time and date stamp machines. Neither of these types of stamps is readily available to the public.

The fact that the envelopes display the town clerks' printed name and title, rendered thereon by the town clerks' machines, sufficiently avoids the risk that unauthorized ballots might be mingled with authorized ballots. Furthermore, all of these envelopes were handled with the procedural rigor that the statutory scheme, as a whole, contemplates. Moreover, such a printed name and title is sufficiently close in degree to strict compliance with the requirement of a "signature" that it draws a cognizable line between substantial and insubstantial compliance. Finally, the strong policy against disfranchising voters in our construction of voting statutes counsels against a holding that the town clerks' substitution of their machine printed names and titles for a rubber stamp of their cursive facsimiles would effect such a disfranchisement.

In sum, we conclude that three of the 413 questioned absentee ballots cast in the towns of Stonington, Old Saybrook, Ledyard and Norwich should not have been counted on election night or in the recanvass. The remaining 410 ballots were validly cast and counted.

ii

Other claimed absentee ballot irregularities

Under this category, Munster challenges the validity of five absentee ballots that were counted in Putnam, East Lyme, Stonington and Plainfield. We consider each claim individually, and conclude that only one of them is persuasive.

With respect to Putnam, Munster claims that a ballot should have been disallowed because it was returned to the town clerk in an outer envelope with a portion of the envelope cut out. The portion cut out was the printed form that the town clerk had filled in prior to delivering the ballot set to the applicant. That printed

form is required by General Statutes § 9-139,[40] which requires that the "outer envelope shall also contain . . . blank spaces . . . upon which the municipal clerk, before issuance of the ballot and envelopes, shall insert the the applicant's name, voting residence by street and number, voting district, [and] the date of the . . . election . . . at which the ballot is to be cast . . . ."

The evidence before us disclosed that, upon inquiry by the town clerk, the voter stated that she did not want the town clerk to know who she was. Nonetheless, the voter had also written on the outer envelope, in the place for a return address, her full name and address, and on the back of the envelope, above the cut out portion, her full address.

Munster claims this as an absentee voting irregularity because "§ 9-139 requires that when the outer envelope is returned to the Clerk, it contain the identification data the Clerk put on it when it was sent to the prospective absentee voter." We disagree.

Section 9-139 constitutes a direction to the town clerk to insert the required information on the outer enve-

---

[40] General Statutes § 9-139 provides: "OUTER ENVELOPE FOR RETURN OF BALLOT. The inner envelope, in which the absentee ballot has been inserted by the absentee ballot applicant, shall be returned to the municipal clerk in an outer envelope endorsed on the outside with the words: 'OFFICIAL ABSENTEE BALLOT'. The outer envelope shall also contain (1) blank spaces for the name and return address of the sender and spaces upon which the municipal clerk, before issuance of the ballot and envelopes, shall insert the applicant's name, voting residence by street and number, voting district, the date of the primary, election or referendum at which the ballot is to be cast and, if the absentee ballot is to be cast at a primary, the name of the party holding the primary and (2) a notice, sufficient to warn any person handling the ballot, of the restrictions set forth in section 9-140b concerning who may possess or return the ballot and the restrictions and penalties set forth in section 9-359 concerning the completion or execution of absentee ballots. The clerk shall also inscribe his official address for the return of the ballot on the outer envelope prior to issuance of the ballot and envelopes. All outer envelopes shall be serially numbered."

lope. The purpose of this statutory requirement is to aid the town clerk's record keeping by making it easier to match the incoming ballots with existing records. The statute does not require that, if the voter, as she did in this case, obliterates that particular part of the outer envelope, the voter be disfranchised, at least where the town clerk can identify the voter and match the voter with his records to determine that the ballot set was completed by the person to whom it was assigned. Because in this case there was sufficient information for the town clerk to make that determination, there was substantial compliance with § 9-139.

With respect to Colchester, Munster claims that the two absentee ballots of a husband and wife, Michael D. Pineault and Christine M. Pineault, should have been disallowed. Although each had applied for and had been sent individual absentee ballot sets, they both returned their inner envelopes in the outer envelope furnished to and identified for Michael D. Pineault. Therefore, Michael D. Pineault's inner envelope was returned inside his own outer envelope, but Christine M. Pineault's inner envelope was returned inside her husband's outer envelope. Both ballots were counted. Christine M. Pineault testified, and we find, that she voted for Munster. Michael D. Pineault did not testify.

Munster argues that "§ 9-139 requires that the voter's ballot be contained in a separate inner envelope enclosed in the outer envelope issued to that voter by the Clerk and containing the identification data the Clerk had placed on that outer envelope at the time of issuance." Therefore, he asserts, *both* "ballots that came in this envelope should not have been counted."

We agree with Munster that § 9-139 requires that each inner envelope be returned to the town clerk in its own outer envelope. That does not mean, however, that under these facts both absentee ballots were

improperly counted. Michael D. Pineault's inner envelope was properly inside his outer envelope. Therefore, his ballot was properly counted.

Christine M. Pineault's inner envelope, however, was not returned inside her outer envelope. Therefore, her ballot should not have been counted. This does not help Munster, however, because she voted for him. Because Gejdenson does not seek to have her disfranchised, we are not inclined to do so. In sum, we conclude that there was one voting irregularity in Colchester, but that under no circumstances could it have harmed Munster.

With respect to East Lyme, Munster claims that the ballot of an absentee voter should have been disallowed because the voter improperly identified himself on the ballot. The face of the ballot clearly indicated the voter's intent to vote for Gejdenson, because he put an "X" in Gejdenson's box. He also put an "X" in the box for the Republican candidates for governor and lieutenant governor, John G. Rowland and M. Jodi Rell. He then, however, crossed out that box, wrote "Delete" next to it, and signed his name underneath. He also put an "X" in the box for the Independence Party candidates for governor and lieutenant governor, Tom Scott and Glen R. O'Keefe. At the top of the ballot, he wrote: "Dear Sir, Please register my vote for Scott instead of Rowland. Thank you. All others remain the same." He then signed his name.

Munster claims that this ballot should not have been counted for Gejdenson because it violated the proscription of § 9-150a ($l$)[41] requiring the rejection of any absentee ballot "marked for the purpose of providing a means of identifying the voter who cast it." We disagree.

[41] General Statutes § 9-150a ($l$) provides: "REJECTION OF MARKED BALLOTS. No absentee ballot shall be rejected as a marked ballot unless, in the opinion of the moderator, it was marked for the purpose of providing a means of identifying the voter who cast it."

Section 9-150a (*l*) does not require the rejection of any ballot on which the voter has identified himself. Rather, it provides that "[n]o absentee ballot shall be rejected as a marked ballot unless, in the opinion of the moderator, it was marked *for the purpose of providing a means of identifying the voter who cast it.*" (Emphasis added.) The question, therefore, is one of the voter's intent in marking his ballot. If his intent was. to provide "a means of identifying" himself, the ballot must be rejected. If, however, he had some other intent in marking his ballot, the ballot does not come within the proscription of § 9-150a (*l*).

Although the statute lodges the initial determination of the voter's intent in the moderator; see also General Statutes § 9-150a (k); we are not persuaded by Gejdenson's argument that, in our review of absentee ballots pursuant to § 9-323, we must give deference to the validity of the moderator's ruling. We agree with Munster that we must determine de novo the voter's intent in casting or marking an absentee ballot.

We have employed such a plenary standard in our appellate review of a trial judge's finding regarding a voter's intent in casting an absentee ballot. See *Hurlbut* v. *Lemelin*, 155 Conn. 68, 230 A.2d 36 (1967).[42] Moreover, ordinarily the question of intent must be determined solely from the ballot itself, because that is all that the moderator or we have available. Because we are as skilled as a moderator in making such a determination and have before us all of the evidence that the moderators had before them, we see no practical or legal benefit to constraining our review and leav-

---

[42] Furthermore, although since 1967, when *Hurlbut* was decided, the voting statutes have undergone considerable revision, nothing in those changes or in their legislative history, which we have examined, indicates any legislative intention to alter the de novo standard of review.

ing in place a factual finding of intent if, in light of all the evidence available, we consider it to have been wrongly determined.

Applying this scope of review to the East Lyme ballot, we find that the ballot was properly counted because the message contained thereon does not violate § 9-150a (*l*). We find that the voter's intent was not to furnish a means of identifying himself as the voter, but rather was to ensure that his change of marking on the gubernatorial line be understood as such, and that all of his other markings be understood to remain the same. Although it would have been preferable for him not to sign his name, taken in context his signature did not invalidate his ballot under § 9-150a (*l*).

With respect to Stonington, Munster claims that the absentee ballots of a husband and wife, Leo Besso and Esther Besso, should not have been counted because each returned his or her ballot to the town clerk in the other's outer envelope. The evidence before us discloses that Leo Besso and Esther Besso applied for and were furnished separate absentee ballot sets. Leo Besso returned his inner envelope inside Esther Besso's outer envelope, and affixed to the outer envelope a preprinted return address sticker with his name on it. He signed his name to the inner ballot in the appropriate place, and dated his signature. That outer envelope was returned to the town clerk in time for the counting of the absentee ballots, and was counted.[43]

Esther Besso returned her inner envelope inside Leo Besso's outer envelope, and printed her name over his name on a similar preprinted return address sticker.

[43] On election day, the election officials decided to permit Leo Besso's ballot to be counted because they inferred that he had simply made a mistake in inserting his inner envelope in his wife's outer envelope, and at that time the records showed that Esther Besso's ballot had not been returned. During the recanvass, Leo Besso's ballot could not, of course, be identified.

This outer envelope did not reach the town clerk, however, until November 14, 1994, six days after election day. Therefore, Esther Besso's ballot was not counted.

Although Munster raises a challenge to Leo Besso's ballot that differs from the challenge he raised to the ballots of the Pineaults in Colchester, we cannot distinguish between the two cases. We agree with his claim that Leo Besso's ballot should not have been counted because it did not arrive in his own outer envelope. See General Statutes § 9-139.

With respect to Plainfield, Munster claims that the absentee ballot of Clara Trahan should not have been counted because her marking of her ballot was not properly authenticated. The evidence before us discloses that Clara Trahan, who is a resident of and properly registered voter in Plainfield, but who lives at a convalescent home in Norwich, voted by absentee ballot pursuant to the statutory provisions for absentee ballot voting supervised by registrars of voting. See General Statutes §§ 9-159q and 9-159r.[44] When she applied for her absentee ballot, she marked an "X" in the box

---

[44] General Statutes § 9-159q, as amended by Public Acts 1993, No. 93-230, §§ 6, 8, provides: "SUPERVISED ABSENTEE VOTING BY PATIENTS AT INSTITUTIONS UPON REQUEST OF REGISTRAR, ADMINISTRATOR. PROCEDURE. (a) Notwithstanding any provision of the general statutes to the contrary, if less than twenty of the patients in any institution in the state are electors, absentee ballots voted by such electors shall, upon request of either registrar of voters in the town of such electors' voting residence or the administrator of such institution, be voted under the supervision of such registrars of voters or their designees in accordance with the provisions of this section. The registrars of voters of a town other than the town in which an institution is located may refuse a request by the administrator of such institution when, in their written opinion, the registrars agree that such request is unnecessary, in which case this section shall not apply. Such registrars shall inform the administrator and the town clerk of the electors' town of voting residence of their refusal. For the purposes of this section, 'institution' means a veterans' health care facility, home for the aged, health care facility for the handicapped, nursing home, rest home, mental health facility, alcohol or drug treatment facility or an infirmary operated

bearing the legend: "I am in an institution where registrars of voters supervise absentee voting." Similarly, she signed the application with an "X." The Plainfield town clerk forwarded an absentee ballot set to the Nor-

by an educational institution for the care of its students, faculty and employees.

"(b) Except as provided in subsection (d) of this section, such request shall be made in writing and filed with the town clerk and registrars of voters of the town of such electors' voting residence, not more than forty-five days prior to an election or thirty-four days prior to a primary and not later than the seventh day prior to an election or primary. The request shall specify the name and location of the institution and the date and time when the registrars of voters or their designees shall supervise the casting of absentee ballots at the institution. The request shall also specify one or more alternate dates and times when supervised voting may occur. No request shall specify a date or an alternate date for supervised voting which is later than the last business day before the election or primary.

"(c) The town clerk shall not mail or otherwise deliver an absentee ballot to an applicant who is a patient in any institution if a request for supervision of absentee balloting at that institution has been filed with the clerk during the period set forth in subsection (b) of this section. The clerk shall instead deliver such ballot or ballots to the registrars of voters or their designees who will supervise the voting of such ballots in accordance with this section.

"(d) Except in the case of a written refusal as provided in subsection (a) of this section, upon receipt of a request for supervision of absentee balloting during the period set forth in subsection (b) of this section, the registrar or registrars of voters who received the request shall inform the registrar or administrator who made the request and the town clerk as to the date and time when such supervision shall occur, which shall be the date and time contained in the request or the alternate date and time contained in the request. If the registrar or registrars fail to select either date, the supervision shall take place on the date and time contained in the request. If a request for supervision of absentee balloting at an institution is filed during the period set forth in subsection (b) of this section and the town clerk receives an application for an absentee ballot from a patient in the institution after the date when supervised balloting occurred, either registrar of voters may request, in writing, to the appropriate town clerk and registrars of voters that the supervision of the voting of absentee ballots at such institution in accordance with this section be repeated, and in such case the registrars or their designees shall supervise absentee balloting at such institution on the date and at the time specified in the subsequent request, which shall be not later than the last business day before the election or primary.

"(e) On the date when the supervision of absentee balloting at any institution is to occur, the town clerk shall deliver to the registrars or their desig-

wich town clerk under the appropriate supervised voting procedure. Trahan executed the ballot, dated the inner envelope, and signed the inner envelope with an "X." Her "X" on the inner envelope is followed by the

nees the absentee ballots and envelopes for all applicants who are electors of such clerk's town and patients at such institution. The ballot and envelopes shall be prepared for delivery to the applicant as provided in sections 9-137 to 9-140a, inclusive. The registrars or their designees shall furnish the town clerk a written receipt for such ballots.

"(f) The registrars or their designees shall jointly deliver the ballots to the respective applicants at the institution and shall jointly supervise the voting of such ballots. The ballots shall be returned to the registrars or their designees by the electors in the envelopes provided and in accordance with the provisions of sections 9-137, 9-139 and 9-140a. If any elector asks for assistance in voting his ballot, two registrars or their designees of different political parties shall render such assistance as they deem necessary and appropriate to enable such elector to vote his ballot. If any elector declines to vote a ballot or, in the opinion of two registrars or their designees of different political parties, is unable to vote a ballot, they shall mark the serially-numbered outer envelope 'rejected' and note the reasons for rejection. Nothing in this section shall limit the right of an elector to vote his ballot in secret.

"(g) After all ballots have been voted or marked 'rejected' in accordance with subsection (f) of this section, the registrars or their designees shall jointly deliver or mail them in the envelopes, which shall be sealed, to the appropriate town clerk, who shall retain them until delivered in accordance with section 9-140c.

"(h) Either supervising registrar of voters may designate any elector of such registrar's town other than an employee of the institution as his designee to supervise the voting of absentee ballots pursuant to this section. The designee shall be sworn to the faithful performance of his duties, and the registrar shall file a certificate of each designation with his town clerk.

"(i) Any registrar of voters who has filed a request that the absentee balloting at an institution be supervised and any registrar required to conduct a supervision of voting under this section, who neglects to perform any of the duties required of him by this section so as to cause any elector to lose his vote shall be guilty of a class A misdemeanor. Any registrar from the same town as a registrar who has filed such a request may waive his right to participate in the supervision of absentee balloting.

"(j) NOTWITHSTANDING ANY PROVISION OF THIS SECTION TO THE CONTRARY, IF THE SPOUSE OR A CHILD OF A REGISTRAR OF VOTERS OR A DEPENDENT RELATIVE RESIDING IN THE REGISTRAR'S HOUSEHOLD IS A CANDIDATE IN THE ELECTION OR PRIMARY FOR WHICH SUPERVISED ABSENTEE VOTING IS TO OCCUR, SUCH REGISTRAR SHALL NOT SUPERVISE SUCH ABSEN-

signature of John H. White, a registrar of voters in Norwich, and his signature is followed by "ROV," indicating his position as registrar of voters. Trahan's ballot was counted.

Munster claims that Trahan's ballot should not have been counted because it violates the provision of § 9-140a that "[a]ny absentee ballot applicant who is unable to write may cause his name to be signed on the form [on the inner envelope] by an authorized agent who shall, in the space provided for the signature, write the name of the applicant followed by the word 'by' and his own signature." We disagree.

TEE VOTING BUT MAY DESIGNATE THE DEPUTY REGISTRAR OF VOTERS OR AN ASSISTANT REGISTRAR OF VOTERS, APPOINTED BY THE REGISTRAR PURSUANT TO SECTION 9-192, TO SUPERVISE THE ABSENTEE VOTING IN HIS PLACE."

General Statutes § 9-159r, as amended by Public Acts 1993, No. 93-230, §§ 7, 8, provides: "MANDATORY SUPERVISED VOTING AT INSTITUTIONS. PROCEDURE. "(a) Notwithstanding any provision of the general statutes to the contrary, if twenty or more of the patients in any institution in the state are electors, absentee ballots voted by such electors shall be voted under the supervision of the registrars of voters or their designees of the town in which the institution is located, in accordance with the provisions of this section. As used in this section, the term 'institution' shall be construed as defined in section 9-159q.

"(b) Application for an absentee ballot for any such patient shall be made to the clerk of the town in which such patient is eligible to vote. The application procedure set forth in section 9-140 shall apply, except that the clerk shall deliver the absentee voting set for any such application to the clerk of the town in which the institution is located, who shall deliver all such voting sets he receives to the registrars of such town, on the date when the supervision of absentee balloting is to occur. The ballots and envelopes shall be prepared for delivery to the applicant as provided in sections 9-137 to 9-140a, inclusive. The registrars or their designees shall furnish the town clerk a written receipt for such ballots. The registrars of the town in which an institution is located and the administrator of the institution shall mutually agree on a date and time for such supervision of absentee balloting, which shall be not later than the last business day before the election or primary.

"(c) The supervision of absentee balloting under this section shall be carried out in accordance with the provisions of subsections (f), (g), (h) and (j) of section 9-159q."

First, we are not convinced that this statutory provision applies to this case. Trahan's "X" constituted a valid signature by her. The law generally has long recognized that one who, for whatever reason, cannot sign his or her name in block or cursive letters, may do so by affixing an appropriate mark. See generally 72 Am. Jur. 2d, Statute of Frauds § 359 (1974). White was not signing the inner envelope for her; he was simply signifying that, in his capacity as a registrar of voters, he had witnessed her mark as her signature.

Second, even if we apply the statute to this case, we conclude that there was no irregularity. White's signature followed by his title, both of which were directly to the right of Trahan's "X," constituted substantial compliance with the statute.

In sum, therefore, with respect to the set of five other claimed irregularities in these identified absentee ballots, we conclude that there were two irregularites, only one of which could possibly have harmed Munster. The remaining three ballots were properly counted.

3

Different Treatment of Similar Cases

Under this category, Munster claims that, in four sets of instances, "disparate treatment[s] of similarly-situated matters" demonstrate significant electoral irregularities. Those four claims involve: (1) absentee ballots in Preston and Middletown that were allegedly treated differently from similar ballots in Old Saybrook, Ledyard, Stonington and Norwich; (2) an absentee ballot in Windham that was allegedly treated differently from a similar write-in machine vote in Tolland; (3) an absentee ballot in Brooklyn that was allegedly treated differently from similar absentee ballots in Old Lyme, Waterford, Plainfield, Old Saybrook, New London,

Windham and Middletown;[45] and (4) an absentee ballot in Waterford that was allegedly treated differently from a similar absentee ballot in Windham. We agree with Munster's second claim above, as indeed does Gejdenson, and conclude that Munster should be credited with one additional vote on the basis of the Tolland write-in vote. We disagree, however, with the other three claims.

i

## Preston and Middletown v. Old Saybrook, Ledyard, Stonington and Norwich

These claims of disparate treatment all involve the treatment of absentee ballot envelopes in various towns with respect to the manner in which they were processed upon their receipt by the respective town clerks. Munster claims that there were two ballots rejected in Preston because they were not stamped as having been received by the Preston town clerk, although in fact they had been timely received by her. He claims that this is disparate treatment from one similar ballot counted in Middletown, three counted in Old Saybrook, six counted in Ledyard, and one counted in Stonington. We agree with Munster that there were isolated inconsistencies. We disagree, however, that these inconsistencies have any legal significance.

The Preston town clerk testified, and we find, that she rejected two ballots because, although she had received them in her office in timely fashion, she had failed to stamp on the outer envelope the date and time

---

[45] In this connection Munster also refers to an absentee ballot cast in Haddam represented in his posttrial brief as "Haddam (Ex. M-14-1)." Our records indicate, however, that Exhibit M-14-1 was not introduced into evidence and is, in fact, Exhibit M-14-1 for identification only. We consider this reference to the ballot cast in Haddam, therefore, to be an oversight, and do not consider it because the exhibit purportedly supporting it is not in evidence.

that she had received them. These envelopes were not introduced into evidence. We conclude that she acted properly in rejecting these ballots. See General Statutes § 9-140c (a) and our discussion of the Old Saybrook absentee ballots in part II B 2 i of this opinion.

The two Preston envelopes were not comparable, however, to the Middletown envelope. Whereas the Preston envelopes were rejected because there was no date or time of receipt noted on them, the Middletown envelope does have the date and time of receipt stamped on it. The Middletown envelope was rejected for a different reason, namely, the lack of the town clerk's signature. Thus, with respect to Preston and Middletown, there was no disparate treatment of similar situations. Furthermore, contrary to Munster's suggestion, the Preston and Middletown envelopes cannot be properly considered together, because they were rejected for different reasons.

The two Preston ballots, which were properly rejected by the town clerk for lack of a date and time stamp, were similar to the three Old Saybrook ballots, which were not rejected by the Old Saybrook town clerk and were counted. Thus, there was an inconsistency between these two towns in the treatment of a total of five ballots. We have determined, however, that the Old Saybrook ballots should not have been counted; see part II B 2 i of this opinion; and, therefore, any such inconsistency has been remedied by our declaration.

Comparing Preston and Middletown with Ledyard and Stonington, however, there was no disparate treatment of similar envelopes. The Preston and Middletown envelopes were properly rejected—the Preston envelope for lack of a date and time stamp, and the Middletown envelope for lack of the town clerk's signature. In contrast, we have concluded that the Ledyard and Stonington ballots were properly counted because the

town clerks' stamp, which contained the dates and times of receipt and the names and titles of the town clerks, substantially complied with all of the statutory requirements.

ii

## Windham v. Tolland

In Windham, an absentee voter wrote in a vote for Gejdenson by writing "3C," Gejdenson's designation, on the write-in portion of his absentee ballot, rather than simply checking the "3C" box. This ballot was properly counted for Gejdenson, in accordance with the voter's expressed intent. In Tolland, however, a voter using the voting machine, intending to vote for Munster by write-in rather than by lever, wrote in "3B," Munster's designation, on the write-in slot of the voting machine. This vote was improperly rejected. We agree, as does Gejdenson, that a vote indicated on the write-in slot of a voting machine should be gauged by the same standard as an absentee ballot: the expressed intent of the voter. Accordingly, one vote should be added to Munster's total.

iii

## Brooklyn v. Old Lyme, Waterford, Plainfield, Old Saybrook, New London, Windham and Middletown

In Brooklyn, the moderator made a ruling regarding a questioned absentee ballot. He endorsed his ruling on the ballot as provided in § 9-150a. In the other towns, moderators made rulings on questioned absentee ballots but did not endorse their rulings thereon.

Although there are superficial inconsistencies in these instances, we conclude that these inconsistencies are de minimis and without legal significance. We regard the provision for endorsement by the moderator of his ruling on a questioned ballot as directory, rather than

mandatory. Its purpose is simply to make a record of those rulings so that the moderator, if later questioned in a recanvass or a subsequent judicial proceeding, may more easily recall the ruling and the reasons therefor. There was no evidence that, in the absence of these endorsements, the moderators' rulings could not be properly challenged or reviewed. The provision, therefore, does not go to the essence of the validity of the ballot or the moderator's task. Thus, although it is preferable for the moderators to comply with this directory provision, the fact that seven moderators did not do so has no legal significance.

iv

## Waterford v. Windham

Munster claims that inconsistent determinations about what constitutes an overvote, which cannot be counted, occurred in Waterford and in Windham. He asserts that, in Waterford, "an absentee ballot with marks in the boxes for Gejdenson and Bingham was counted for Gejdenson . . . whereas in Windham an absentee ballot marked in the same boxes was correctly rejected as an overvote." We find to the contrary.

This problem arises from the fact that, in Connecticut, when candidates have received the nomination of more than one party, the names of the candidate appear more than once on the ballot. For example, in this election, the name of Joseph Lieberman, a candidate for office of United States Senator, appeared on one line of the ballot as the nominee of A Connecticut Party (ACP) and on another line of the ballot as the nominee of the Democratic Party. This dual listing can lead some voters to mark the names of their preferred candidates at each place on the ballot where that name appears. Such ballots, crowded with multiple markings for particular candidates, may be difficult for some voters to verify. Voters may be confused because they have mis-

takenly marked not just their preferred candidate's name as it is listed by two different political parties, but may also have inadvertently marked the names of two different individuals who are candidates for the same office. Both of Munster's allegations relate to such duplicate markings.

In light of the evidence before us and the complexity of the Connecticut ballots during this election, we conclude that the Waterford ballot was properly voted for Gejdenson. This ballot discloses that the voter voted for all of the Democratic candidates, including Gejdenson, with the exceptions of the Democratic candidates for governor and lieutenant governor, by filling in their boxes with black ink. The voter voted in similar fashion for the ACP candidates for governor and lieutenant governor, and for two charter questions that were on the ballot. The voter also registered his intent to vote for eight of the ten candidates on the ACP line, all eight of whom were the same candidates listed on the Democratic line for whom he voted by filling in their boxes. This intent was expressed, not by an "X" but by a clear check mark, in the eight boxes for those eight candidates on the ACP line.[46]

The two ACP candidates for whom the Waterford voter did not express an intent to vote were Bingham and the candidate for sheriff. Both of these candidates were different from the Democratic candidates for the same office. The voter left the sheriff's box blank on the ACP line. In the Bingham box, there is a small vertical line that does not resemble in any way the check marks in the other eight ACP boxes. It is quite different in form, size and intensity. Applying our de novo scope of review to determine the voter's intent, we find that he did not intend to register a vote for Bingham and, therefore, there was no overvote.

[46] Of course, by law these doubly expressed votes were counted only once for each candidate.

In Windham, by contrast, the voter entered a definite "X" in each of the eleven ACP line boxes and in each of the twelve Democratic line boxes. These included a definite "X" in both Gejdenson's and Bingham's boxes. There is no way to differentiate between the "X" for Gejdenson and the "X" for Bingham, as indeed there is no way to differentiate between the various "X" marks entered in all of the other boxes on both the ACP and Democratic lines. Applying our de novo scope of review to this ballot, we find that this ballot was properly rejected as an overvote. See General Statutes § 9-150a (j) (1). Therefore, there was no disparate treatment between the Waterford and Windham ballots.

In sum, with respect to this category of alleged disparate treatment of similar ballots, we conclude that there was one instance of such treatment and that, as a result, Munster's total vote count must be increased by one. We also conclude that there was one other instance of disparate treatment that has in effect been remedied by our earlier declaration herein that three ballots in Old Saybrook should not have been counted. We conclude further that there were some isolated instances of inconsistent treatment that were without any legal significance. Finally, we conclude that there was no disparate treatment of similar ballots in the remaining instances claimed.

### 4

### Other Irregularities

In this category, Munster asserts that other irregularities that occurred in two towns—East Lyme and Lebanon—substantiate his claim that the election results are fundamentally flawed. We find no such irregularities.

i

## Errors in tallying votes

Munster claims that in East Lyme "an absentee ballot counter who recorded 62 votes for Gejdenson erased it and put down 64 votes, based upon what his partner across the table had." Our review of the evidence persuades us that this characterization is contrary to the facts.

In light of the credible testimony of Mary Grace Smith, who was the head moderator both on election night and during the recanvass, we find as follows. The recanvass, which is the relevant point in time for purposes of this claim, was conducted with scrupulous care and accuracy. The absentee ballot counters counted the ballots in packets of ten. Furthermore, periodically the counters compared their tallies with each other, and exchanged their packets for recounting, so that the ballots were counted not once, but twice. If at any time there was a discrepancy between the tallies, it was ultimately reconciled by the double count process. There is no credible evidence that an absentee ballot counter erased his count of sixty-two for Gejdenson and put down sixty-four based on the numbers that the other absentee ballot counter had recorded. Any erasure that may have occurred was simply a correction of a human error in recording, and consequently had absolutely no factual or legal significance with respect to the final count. Any change of recorded vote counts by any counter during the recanvass process could not have resulted, and did not result, in an inaccuracy in the final count. At the end of this scrupulous and painstaking process, both absentee ballot counters had exactly the same numbers for each candidate, and those numbers were correct.

ii

### Discrepancies between the number of voters counted by hand and by machine

Munster claims that in Lebanon "the public counter on the machine in District One was three more than the number of people checked off as voting. The reasons given were in large part suppositious . . . . In District Two the total of the public counters for all machines was one more than the number checked off on the official checklist." As a factual matter, we agree with the numerical discrepancies stated by Munster. We disagree with his characterization of the reasons given for the discrepancies as suppositious, and we conclude that the discrepancies were wholly without factual or legal significance.

The facts relevant to this claim are as follows. The "public counter" on a voting machine is a counter, visible on the side of the machine, that registers the number of persons who used the machine to vote. It is supposed to be "zeroed"—that is, the visible digit on the counter is to be brought to zero—by a voting machine mechanic before the voting begins. Before the polls open, the moderator checks that the public counter is set at zero, and at the end of the voting day the moderator reads and records on his tally sheet the ending number on the public counter.

Upon entering a voting machine, the voter pulls the red lever to the right in order to close the curtain on the machine. After voting by pulling down the levers above the candidates' names, the voter pulls the red lever back to the left to open the curtain. If the machine operates properly, the counter advances by one digit each time a voter pulls the red lever back to the left. At the end of election day, the election officials com-

pare the public counter number to the total number of voters who voted according to the official checklist.

Four voting machines were used in District One. During the day, one of the machines experienced a mechanical problem. The curtain failed to open when a voter pulled the red lever to the left, and the voter exited the machine through the closed curtain. The moderator determined that this voter had not moved the red lever sufficiently to the left to open the curtain, and asked one of the election workers who had not yet voted, but who was eligible to vote in that district, to use the machine to vote. The election worker did so, and upon moving the red lever to the right in order to close the curtain, the curtain opened instead. To correct the problem, the machine tender pressed the entry button and the voter pulled the red lever back to the left and again to the right in order to close the curtain, thereby registering a nonexistent additional voter.

In addition, later during the day a voter using the same machine reported a malfunction when he attempted to pull down the lever for governor. The moderator concluded that the voter had accidentally pulled down the write-in slot lever for governor, which automatically locks the pull down levers for that office. At that point, the machine was opened without registering the voter's vote, and the moderator took the machine out of service and substituted a different machine, which the voter used.

At the end of election day, there was a three vote discrepancy between the total of the numbers on the public counters, 1117, and the total number of voters who, according to the official checklist, had voted by machine, 1114. The moderator concluded, and noted on his return, that two of the votes that form the discrepancy were caused by the machine adding a vote for each of the two times that it was opened when no

vote had been cast, as described above, and that the third vote "was probably due to the large crowd of voters at a separate time and someone must have gotten through without getting checked off the list."

There is nothing suppositious, as Munster claims, about these inferences. We find to be rational and justifiable the inference that the machine malfunctions, as described above, account for two out of the three additional votes registered on the public counter over the number of voters indicated on the official check list. We also regard as rational and justifiable the inference that, during a busy and crowded time at the polling place, one voter went through the checkoff procedure without having his name checked off and subsequently voted. This one vote discrepancy was caused not by an improper vote being cast on the machine, but rather by an inadvertence, the absence of which would have resulted in the total from the official check list being 1115, rather than 1114.

In District Two, the total number of votes shown on the public counters of the four machines used was 1534. The total number of voters according to the official check list was 1533. There was, therefore, a discrepancy of one. The moderator concluded, and noted on his return, as follows: "The discrepancy of one voter is presumed to be an oversight by the official checkers during unusually heavy voting between the hours of five and 7:30 p.m." As discussed previously, there is nothing suppositious about this inference.

In sum, under this category of alleged irregularities, we conclude that Munster's claims were not proven. All of the explanations offered by the moderators for the numerical discrepancies were appropriately based on ordinary human experience or mechanical error. The processes of checking in voters at the polls and of voters using voting machines are human processes. People are

fallible, even when they strive to do their job carefully. Machines are also imperfect, and even when well maintained they may malfunction. Moreover, there is absolutely no proof, and no basis for a rational inference, that any person was improperly permitted to vote in either District One or District Two. We are entirely unpersuaded that these discrepancies, which are trivial in light of the total number of voters processed and, moreover, are wholly understandable, support Munster's case in any way.

## C

### SUMMARY REGARDING IRREGULARITIES CLAIMED BY MUNSTER

Having fully evaluated all of the irregularities claimed by Munster, beyond those addressed by the Norwich recount, we reach the conclusion that, of all those claimed, there were only eight irregularities that had any legal significance: three voters were improperly permitted to vote; four absentee ballots were improperly counted; and one write-in vote for Munster was improperly rejected. With respect to this last instance, we conclude that Munster's total vote count, including those votes added thereto as a result of the Norwich recount, must be further increased by one. After the Norwich recount, we showed a preliminary lead by Gejdenson of twenty-two votes. Adjusting that figure by the one vote increase for Munster, Gejdenson's lead, after consideration of all of Munster's claims, including the Norwich recount, is twenty-one votes.

With respect to the other seven irregularities, there was no proof regarding for whom those improper votes were cast. Even, therefore, if we were to indulge in an assumption that they were all cast for Gejdenson, the result of the election would not be changed, because under that hypothesis Gejdenson's lead would be reduced to fourteen, and he would remain the winner.

See *Scully* v. *Westport*, supra, 145 Conn. 651; *Armstrong* v. *Hartford*, 138 Conn. 545, 551, 86 A.2d 489 (1952); *Donovan* v. *Davis*, 85 Conn. 394, 400, 82 A. 1025 (1912); *State ex rel. Andrew* v. *Lewis*, 51 Conn. 113, 124 (1883).[47]

In this connection, we address an issue that was raised in final oral argument. That issue is whether we should order a recount of the absentee ballots in the remaining fifty-three towns, other than Norwich, in the district. We conclude that there is no basis for such a remedy.

First, as a procedural matter, it is clear that, in his posttrial brief, Munster abandoned any claim for a recount of the absentee ballots in the other towns, and confined his requested relief to a new election, despite his claim in final oral argument that he was also requesting a recount of the absentee ballots in the remaining fifty-three towns.[48] Nonetheless, rather than rest our rejection of such a possible recount on this

[47] This conclusion also renders it unnecessary for us to consider Gejdenson's claim that, despite the constitutional guarantee of ballot secrecy; see Conn. Const., art. VI, § 5; Munster could have, but did not, seek to prove for whom those seven votes were cast by requesting the voters to waive their privilege of ballot secrecy. See also *Mansfield* v. *Scully*, 129 Conn. 494, 505, 29 A.2d 444 (1942) (where appropriate, policy of ballot secrecy may be required to yield to policy of determining properly elected official).

[48] Munster's posttrial brief opens with the following passage: "When the evidence is viewed in the light of the law, the conclusion is ineluctable that the errors, irregularities and departures from statutory mandates that characterized the election of United States Representative for the Second Congressional District in 1994—as unaffected by fraud, malice or improper motive as those errors were, and as frequently attributable as they were to simple human fallibility in the press of a contentious contest—cast a cloud of eternal doubt and uncertainty over the true and accurate count of validly-cast ballots in this election that must be dispersed. *The conclusion based upon the evidence is equally compelled that that cloud cannot be dispersed by recourse simply to a recount, for there were votes counted that should not have been counted but that cannot be identified, isolated and discarded at this stage. The only remedy, accordingly, that will give the residents of*

ground, we address on its merits the question of whether, on this record, there should be a recount of

*the Second Congressional District that assurance they are entitled to have that their will has been reflected truly and accurately is the holding of a new election."* (Emphasis added.)

This emphatic statement is followed by the following: "From these cases [decided under statutes analogous to § 9-323] we find no law differentiating between criteria to be applied in ordering a recount and criteria to be applied in ordering a new election. *We inevitably repair to logic and reason to conclude that a new election must be ordered when the Panel concludes that a recount will be inefficacious to remedy the facts and conclusions the Panel finds in the matter."* (Emphasis added.) He then states: "If it appears that the outcome of the election would have been different if irregularities had not occurred—that is, if it appears that the counting of votes that were counted but should not have been, or that were not counted but should have been, would have changed the result—the Panel may certainly invalidate the election. *Armstrong* v. *Hartford,* [supra, 138 Conn. 551]. If it is impossible legally to ascertain those facts, reason dictates that if the outcome is determined by a particular number of votes—here, 4, the margin between Messrs. Munster and Gejdenson—*and it cannot be ascertained how those who voted improperly voted or how those who improperly were disfranchised would have voted, but it can be determined that there were 4 or more such voters, a new election would likewise be justified."* (Emphasis added.)

Finally, Munster, in his posttrial brief, after referring to the fact that initially he "had thought that perhaps a recount of all the absentee ballots in all 54 towns would resolve the matter," and after stating that such a recount could not dispel "the dark cloud of doubt and uncertainty over the election," concluded as follows: "The voters deserve to have a Congressman chosen in a manner that satisfies them that their will has flowed cleanly and smoothly through the electoral process, and that whoever is elected is elected by *them,* and not by the expedient of moving their votes around the election grid like pieces on a chessboard (especially where there has been no recount in 53 of the District's 54 towns). The voters deserve a new election.

"[Section] 9-323, in providing for these proceedings, has afforded the setting for adducing facts and demonstrating the need for a new election. Public confidence in the integrity of the election result, which ultimately is the only real safeguard to public acceptance of governmental authority in a representative democracy, requires a new election. This Panel should order a new election." (Emphasis in original.)

Although Munster argues that the parenthetical "(especially where there has been no recount in 53 of the District's 54 towns)" is a claim for a recount, we cannot read it as such in context. Furthermore, there *has* been a recount in every town of the district, and Munster has offered no rational explanation for why a second recount would yield different results from the first recount.

the absentee ballots in the other fifty-three towns. We conclude that there should not be such a recount.

Section 9-323 provides in relevant part: "If sufficient reason is shown, [the panel] may order any voting machines to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judges shall thereupon, in the case they, or any two of them, find any error in the rulings of the election official, any mistake in the count of such votes or any violation of said sections [9-355, 9-357 through 9-361, 9-364, 9-364a or 9-365, which are not involved in this case], certify the result of their finding or decision, or the finding or decision of a majority of them, to the secretary of the state before the first Monday after the second Wednesday in December." The predicate for any action of the panel, therefore, including the ordering of a recount, is that "sufficient reason is shown." Furthermore, such a "sufficient reason" must, insofar as this case is concerned, be based upon an "error in the rulings of [an] election official, [or a] mistake in the count of [the] votes." There is nothing in this record to suggest that, in the other fifty-three towns of the district, there was any ruling of an election official or any conduct in the count of the votes that is not already adjudicated in this opinion. Thus, aside from any claims so adjudicated, there is nothing in the record to suggest any such improper ruling or mistake.

The legislature has wisely responded to the risks inherent in a close election by mandating an automatic recount, which was conducted throughout the district. Thus, there have already been two counts of the votes in those fifty-three towns—one on election night, and one during the mandatory recanvass ordered by the secretary of the state. At that recanvass, the election officials, accompanied by observers representing both candidates, were able to focus their attention on this

contest, without the haste required of the election night count. The recanvass was performed under necessarily less hurried and difficult conditions than the election night canvass, because there was more time available and the election officials were concerned, not with the results of all of the offices on the ballot, but only with this contest and that for the office of the secretary of the state. See footnote 4. The results of that recanvass have been duly returned to the secretary of the state. Munster had the opportunity to have observers at each of the fifty-three town recanvasses, and the opportunity of bringing to this panel any evidence of any erroneous rulings of election officials, of any mistakes in those counts, of any ballots that should not have been counted but that were counted, of any ballots that were counted but that should not have been counted, and of any other misconduct that could conceivably have occurred during the canvass and recanvass in those towns. Other than the evidence he brought forward regarding specific instances of claimed irregularities in some of those towns, which we adjudicate in this opinion, he has produced no other evidence or claims of irregularities occurring in those towns.

There is, moreover, nothing in the recount of the Norwich ballots that we ordered that relates in any way to the absentee ballots in those fifty-three towns. Undoubtedly, the ballots and the counting technology used in the election and reviewed in our recount in Norwich were unlike anything used in the other fifty-three towns.

Moreover, Munster's claim for another recount in the other fifty-three towns, in the absence of specific evidence regarding those towns beyond that already adjudicated herein, is contrary to existing precedent. In *State ex rel. Andrew* v. *Lewis*, supra, 51 Conn. 113, the petitioner, an unsuccessful candidate for mayor of New Haven, argued that the trial court should have ordered

a recount in those wards other than those covered by his petition and his proof. This court stated: "Under this statute a petitioner must allege the facts on which his claim to have been elected is based, and he must prove those allegations by [a] preponderance of [the] evidence as in all other cases. If he claims that mistakes had been made in the counting of votes in some particular ward or wards of the city, the correction of which would change the result, he must make out a *prima facie* case that such mistakes had been made before a recount of the votes in such ward or wards can be made. In such cases it will be presumed that the counting of votes in all the other wards of the city was correct, until the contrary appears." Id., 123. This common sense principle was reaffirmed in *Donovan* v. *Davis*, supra, 85 Conn. 400, and has never been questioned.

Munster's argument reduces to the assertion that, because this was a close election, and because there were some irregularities in some absentee ballots in the several towns with regard to which he did produce evidence, we should therefore infer that substantial irregularities occurred with regard to unchallenged ballots cast in those and other towns.[49] There is no basis

---

[49] Munster's argument in this regard, articulated at final oral argument, is as follows: "Let me put a pronoun where a pronoun should have gone. By *our* finding of these irregularities, not *your* finding, but *our* findings of these irregularities in an election this close to be determined by the shuffling of votes, essentially what *we* are doing is finding an erosion of public confidence not in the decision of this Panel but the very fact that these irregularities were found *by us* inevitably raises in the public mind a question as to whether there was more we didn't find." (Emphasis added.) That this was not a slip of the tongue is confirmed by Munster's response to a question by the Chief Justice asking him to "unbundle" his claim for a recount from the Norwich recount already conducted: "[T]he bundling is not based upon *your* decision on those alleged irregularities. The bundling *is based upon the allegations of those irregularities* . . . ." (Emphasis added.)

This is truly an astonishing argument: we should order a recount of the other fifty-three towns, despite our findings of but a handful of irregulari-

for such an inference. On the contrary, we conclude that, after the election night canvass, and after the recanvass at which the counters were required only to count the ballots with respect to this contest and that for the office of the secretary of the state, the absence of any evidence in this case whatsoever regarding those fifty-three towns, other than the evidence concerning the claims already adjudicated, indicates that the recanvass counts in those towns were accurate.

Thus, we reject the suggestion of Munster that a recount of the absentee ballots in the other fifty-three towns is necessary to dispel a cloud of doubt and uncertainty over this election. We have heard and have carefully considered all of the evidence presented to us regarding any claims of irregularity in voting and vote counting in the election. We have carefully considered, and adjudicate in this opinion, all the factual and legal claims made by Munster pursuant to which he challenges the result of the election. None of the evidence presented supports the inference that the claimed irregularities were just the tip of the iceberg. To the contrary, the fact that Munster has raised specific claims regarding the casting of ballots in many of the towns in the district leads us to conclude that he had ample opportunity to pursue all possible irregularities based on the canvass and recanvass already conducted.

The result of that adjudication is that, with respect to those fifty-three towns, there were *four* absentee ballot irregularities, out of a total of approximately *8500* absentee ballots cast in those towns. There were an additional *four* nonabsentee ballot irregularities out of

ties in the towns on which the parties produced evidence for five days, based not on our findings or anything we heard in evidence but on Munster's naked allegations of irregularities, about which he failed to produce a shred of evidence. If that were the basis for a court to order a recount under § 9-323, the result would be a mockery of the hearing contemplated by the statute, because its outcome would be a foregone conclusion.

a total of approximately *188,000* nonabsentee votes cast in those towns. The "cloud" that Munster perceives is no more than a chimera, conjured up out of rhetoric. It has no basis in fact, law or reason. It simply does not exist.

Indeed, these startling figures suggest more general factual findings and conclusions that we now address. Until this point in this opinion, we have been focusing our lens narrowly on the specific factual and legal claims of the parties, and on the specific evidence supporting and contradicting those claims. We cannot conclude this opinion, however, without also describing, in a more general way, the overall portrait that the evidence before us painted of the entire electoral process, and of the election officials who participated therein, in the district for this election.

The evidence persuades us that this was an eminently fair and accurate election. Beginning with the process of applications for absentee ballots, which began weeks before the election, through the many steps of the electoral process culminating in the recanvass and the Norwich recount, the election officials of the district worked with enormous diligence, honesty and success to ensure that every voter entitled to vote was afforded his or her opportunity, that every vote was counted truly, honestly and accurately, and that the candidate with the greater number of votes was declared the victor. This was consistently done without regard to party affiliation—whether of the voter or the official. At every step of the way, the election officials of the district worked impartially and with scrupulous attention to their official duties in order to ensure as much as possible that this election effected the will of the people of the district. This election was a model of our democracy in action.

## III

### CONCLUSION

According to the returns of the mandatory recanvass, Gejdenson received a total of 79,160 votes. From that total, we subtract 5711, which was the total of his votes from Norwich according to that recanvass, for a preliminary subtotal of 73,449. To that figure we add 5687, which is the total of Gejdenson's unchallenged votes from the Norwich recount, for a further preliminary subtotal of 79,136. To that figure, we add 52, which is the number of votes he gained from the 73 challenged ballots in the Norwich recount, resulting in a total vote count for Gejdenson of 79,188.

According to the returns of the mandatory recanvass, Munster received a total of 79,156 votes. From that total, we subtract 3802, which was the total of his votes from Norwich according to that recanvass, for a preliminary subtotal of 75,354. To that figure we add 3793, which is the total of Munster's unchallenged votes from the Norwich recount, for a further preliminary subtotal of 79,147. To that figure, we add 19, which is the number of votes he gained from the 73 challenged ballots in the Norwich recount, for a further preliminary subtotal of 79,166. To that figure, we add 1, which is the write-in vote from Tolland for which he should have been credited, for a total vote count for Munster of 79,167.

Accordingly, pursuant to General Statutes § 9-323, and in accordance with the findings and conclusions rendered previously, we certify to the secretary of the state as follows: the number of votes cast for Sam Gejdenson for the office of the United States Representative for the Second District of Connecticut in the election of November 8, 1994, was 79,188; the number of votes cast for Edward W. Munster for the office

of the United States Representative for the Second District of Connecticut at the election of November 8, 1994, was 79,167. The winner of the election was Sam Gejdenson.

We vacate our earlier order directed to the secretary of the state, the treasurer and the comptroller of this state concerning their duties under General Statutes § 9-315.

We further order all of the town clerks of the fifty-four towns in the Second Congressional District to preserve all election materials used in that election until such time as the new United States House of Representatives that convenes in January, 1995, has, pursuant to article one, § 5, of the United States constitution, approved the qualifications of and accepted as a member of the House of Representatives a person as the United States Representative for the Second Congressional District of Connecticut.

In this opinion PETERS, C. J., concurred.

BERDON, J., concurring. Although I agree with the result reached by this panel, I write this concurrence in order to emphasize several important matters that I considered in resolving this election dispute. The dispute before us is more than just a contest between Sam Gejdenson and Edward W. Munster to represent the Second Congressional District of Connecticut. It is also about whether the true choice of the electorate of the second district will take his seat in the United States House of Representatives. Therefore, the constitutional right of the voters to have their votes counted in an effective and fair manner is also implicated in this case. It is clear to me that the failure to count legal ballots that were properly cast as well as the erroneous counting of illegal ballots can effectively taint the results of a close election. Any such miscount, therefore, poten-

tially impinges on the constitutional right to vote and must be thoroughly evaluated. See generally Conn. Const., art. IV.

Any election in which large numbers of people exercise their fundamental right to vote may contain irregularities and discrepancies. When many moderators and other election officials are called upon to make judgment calls and apply very complex absentee ballot laws, disparate treatment of similar ballots is likely.[1] Indeed, the likelihood of such irregularities and discrepancies occurring is perhaps greater in an election of the magnitude of a congressional race, where many towns and voting precincts are involved and where election officials may make decisions on the spur of the moment that deviate from our election laws or our courts' interpretations of these laws. A congressional election, however, is not normally decided by a plurality of four votes or even twenty-one votes but by a plurality of at least hundreds and usually thousands of votes. With a plurality of thousands or even hundreds, minor irregularities become inconsequential and the results of the election are still fair. A plurality of four votes, however, makes each individual deviation significant. Therefore, in fairness to the parties—Mr. Gejdenson and Mr. Munster—and, more importantly, in fairness to the electorate of the Second Congressional District, it must be emphasized that we are deciding this dispute through a lens of a plurality of four votes in an election wherein 196,000 persons voted and in which 9197 absentee ballots were cast in many voting precincts.

I

Although this is a case of first impression brought pursuant to General Statutes § 9-323, we are not with-

[1] Indeed, an entire chapter of our state statutes; chapter 145; which includes forty-four separate sections, is devoted to absentee voting.

out precedential guidance. Pursuant to other statutes that govern election disputes the Supreme Court of Connecticut has developed a jurisprudence that is clearly applicable to the counting of ballots for any election, including an election disputed pursuant to § 9-323. The overriding principle is that courts should be reluctant to invalidate ballots "because such action effectively disfranchises the voters involved." *Wrinn* v. *Dunleavy*, 186 Conn. 125, 141, 440 A.2d 261 (1982). "Where the legislature in express terms says that a ballot shall be void for some cause, the courts must undoubtedly hold it to be void; but no voter is to be disfranchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his favor. Unless a ballot comes clearly within the prohibition of some statute it should be counted, if from it the wish or will of the voter can be ascertained. *Dombkowski* v. *Messier*, 164 Conn. 204, 207, 319 A.2d 373 (1972); *Hurlbut* v. *Lemelin*, 155 Conn. 68, 77, 230 A.2d 36 (1967); *Scully* v. *Westport*, 145 Conn. 648, 651–52, 145 A.2d 742 (1958); *State* v. *Bossa*, 69 Conn. 335, 341, 37 A. 977 (1897). But the right to vote is not absolute and is subject to regulation by the legislature. *Mills* v. *Gaynor*, 136 Conn. 632, 636, 73 A.2d 823 (1950). See generally General Statutes, Title 9." (Internal quotation marks omitted.) *Wrinn* v. *Dunleavy*, supra, 141–42. Indeed, the legislature has codified this jurisprudence, which favors the intent of the elector, with respect to the counting of absentee ballots. See General Statutes § 9-150a (j).

Applying these principles, I agree with my colleagues, Chief Justice Peters and Justice Borden, regarding the disposition of the contested ballots. In light of the record before us, the outcome of the election of the United States Representative for the Second Congressional District on November 8, 1994, should be adjusted so that it reflects the following: Sam Gejdenson received

a total of 79,188 votes and Edward W. Munster received a total of 79,167 votes. Accordingly, Gejdenson has a plurality of 21 votes and is the winner of the election.

## II

Mr. Munster, in addition to seeking a new election, claims he is also entitled to a recount of the absentee ballots cast in all the voting precincts of the fifty-four towns in the Second Congressional District of Connecticut.[2] He claims that if such a recount is not ordered, the public confidence in the process and the appearance of regularity and propriety in the election will be eroded.

Section 9-323 allows for such a recount if "sufficient reason is shown." Like similar recount statutes for other public offices, § 9-323 does not provide what facts must be proven to establish "sufficient reason" before we may exercise our authority to order a recount. Nevertheless, decisions of the Supreme Court of Connecticut regarding the authority of a judge of the Superior Court to order such a recount pursuant to other election statutes have equal application to the case before this panel. "Before ordering such recount [we] should be satisfied that the petitioner's claim is made in good faith, and upon reasonable grounds; but what evidence should be considered sufficient for that purpose is a matter resting largely in the judgment and discretion of the [panel] . . . ." *Conaty* v. *Gardner,*

---

[2] I do not agree with my colleagues' assertion that Munster abandoned his claim for a recount of the fifty-three remaining towns in the Second Congressional District merely because he did not succinctly raise it in his posttrial brief. Munster clearly raised the claim for a recount in his petition and argued strenuously and at length for a full district recount when the panel considered whether to order a recount in Norwich. He also raised the claim in final arguments before this panel. Furthermore, the issue of waiver was never raised by Gejdenson but was interjected into the proceedings by a member of this panel.

75 Conn. 48, 52, 52 A. 416 (1902).[3] The standard for granting a recount in an election dispute brought under § 9-323, therefore, is purely discretionary and must be based upon an evaluation by the panel of all the facts and evidence before it. From the facts of this dispute, the evidence produced by the parties and the concessions of counsel, it is clear that a recount would reveal no new irregularities in the voting process and that the panel properly exercised its discretion to deny an additional recount.

After the election, each of the fifty-four cities and towns that comprise the Second Congressional District conducted a statutorily mandated recanvass of all the votes, including both machine-counted and absentee ballots, pursuant to General Statutes § 9-311a. In compliance with state procedures, the recanvass was done publicly under the supervision of election officials including the Democratic and Republican registrars of voters.[4] In addition, both Munster and Gejdenson had observers at each voting precinct during the recanvass. Munster's observers were able to identify all the so-called "problem ballots." Indeed, all of these problem ballots were brought before us and we have ruled on each.

Because of my concern regarding the closeness of the election, at oral argument, after the completion of the evidentiary phase of this proceeding I inquired of counsel for Munster whether his claim for a recount of all the absentee ballots was based on any problem ballots that Munster's observers at the recanvass may have failed to identify. His answer: "You have all those that

---

[3] It must be noted that there is no question regarding Munster's good faith in bringing this petition to review an election result in which his opponent had a four vote plurality in an election in which over 196,000 persons voted.

[4] The procedure is detailed in the Recanvass Procedural Manual, September, 1994, issued by Pauline Kezer, secretary of the state.

we identified, and we don't have any right to say oh, we just found another one or oh, we just thought of another one.'' After further questioning, counsel for Munster again assured me that he knew of no other irregularities. I was also assured by counsel that, during the mandatory recanvass of all the votes in the Second Congressional District, the election officials had been directed to inspect and recount *all* of the absentee ballots. There was never a claim that the observers for Munster may have failed to identify any problem ballots,[5] and indeed, Munster never challenged the accuracy of the machine counts (except, of course, in Norwich). Furthermore, in order to make certain that Munster did not claim error in absentee ballots that had not been opened because of some irregularity in the town clerk's office or because they had been received late, and cognizant of Munster's claim of disparate treatment of the counting of absentee ballots,[6]

---

[5] One claim made by Munster was that in the town of Groton, ''town election officials kept observers from both candidates at a distance of ten feet which prevented them from observing the actual ballots.'' Munster did not pursue that claim before the panel.

[6] In regard to Munster's claim of disparate treatment by election officials of similar absentee ballots, the evidence disclosed the following. The Procedure Manual For Counting Absentee Ballots prepared by the secretary of the state for 1994 provided on page 7 that ''if an outer envelope is not endorsed with the date, time and signature of the [town] clerk, the [absentee] ballot *cannot* be counted.'' (Emphasis in original.) On the other hand, Michael Kozik, an attorney in the elections division of the secretary of the state's office, testified that his office advised town clerks and other election officials that even if the outer envelope was not *signed* by the town clerk, the ballot could be counted because it would be in substantial compliance with the statute. He testified that this advice ''has been given orally over the phone a number of times by a number of people'' in his office. He acknowledged the conflict between his office's advice and the published manual, and that election officials would only know about the substantial compliance rule if they called his office. He also acknowledged that the procedure manual was misleading in this regard.

Notwithstanding this problem, as a result of the recanvass, all the outer envelopes were reviewed and Munster's representatives identified which ballots were to be contested before this panel. Both opened and unopened ballots that were contested pursuant to this review were identified for us, and we have ruled on each claimed irregularity.

I again inquired and was again assured by counsel for Munster that these unopened ballots had been inspected during the recanvass.

Given the record before us, and with full awareness of and sensitivity to the importance of being as thorough as possible because of the small plurality, I agree with the other panel members that it is not necessary to order a recount of the absentee ballots in the remaining fifty-three towns.[7] Of course, if there had not been a complete recount pursuant to the statutorily mandated recanvass, I would have come to a different conclusion on Munster's claim for a recount now.

Accordingly, I agree with the result reached by my colleagues.

[7] There has already been a full recount of the votes cast in the town of Norwich. Both parties agreed to the recount and it was ordered by this panel.